ITEL CONTAINERS INTERNATIONAL,
CORP., Plaintiffs,

v.

ATLANTTRAFIK EXPRESS SERVICE,
LTD., et al., Defendants.

Nos. 86 Civ. 1313 (RLC), 86 Civ. 2366
(RLC) and 86 Civ. 3717 (RLC).

United States District Court,
S.D. New York.

Nov. 22, 1989.

Burlingham, Underwood & Lord (Alfred E. Yudes, Jr., Amy S. Rich, of counsel), O'Melveny & Myers, (Andrew J. Frackman, Bernard J. Vaughan, of counsel), Kirlin, Campbell & Keating (Michael D. Wilson, of counsel), New York City for plaintiffs.

Carter, Ledyard & Milburn (James Gadsden, Beth D. Jacob, of counsel), New York City, for defendants.

ROBERT L. CARTER, District Judge.

Plaintiffs in this consolidated action are: Itel Containers International Corp. ("Itel"), a corporation organized under the laws of Delaware; Flexi–Van Leasing, Inc. ("Flexi–Van"), a corporation organized under the laws of Delaware; Textainer Incorporated ("Tex"), a corporation organized under the laws of Panama; and Textainer Special Equipment, Ltd. ("TSEL") (formerly Cross County Leasing, Ltd.), a limited corporation organized under the laws of England. All are engaged in the international maritime business of leasing cargo containers and/or chassis, and/or flatracks and related equipment to ocean carriers and others.

Defendants are: Sea Containers, Ltd. ("SCL"), a limited company organized un-

der the laws of Bermuda with James B. Sherwood its president and chief executive officer; Sea Containers Services, Ltd. ("SCS"), a wholly owned subsidiary of SCL, and a limited company organized under the laws of England; Orient Express Hotels, Inc. ("OEH"), a corporation organized under the laws of New York; Orient Express Hotels Services, Ltd. ("OEHS"), a wholly owned subsidiary of OEH, and a limited company organized under the laws of England; Sea Containers Australia, Ltd. ("SCAL"), a wholly owned subsidiary of SCL, and a limited company organized under the laws of Australia; Sea Containers America ("SCA"), a wholly owned subsidiary of SCL, and a corporation organized under the laws of Delaware.

Elliott Maritime, Ltd. ("Elliott Maritime"), a limited company organized under the laws of Hong Kong as "Poudane Shipping Co., Ltd.;" Atlanttrafik Express Service, Ltd. ("AES, Ltd."), a wholly owned subsidiary of Elliott Maritime, a limited company organized under the laws of England and Atlanttrafik Express Service, Inc. ("AES, Inc."), a wholly owned subsidiary of AES, Ltd., a corporation organized under the laws of New York.

Nagara, Ltd., a wholly owned subsidiary of SCL, a limited company organized under the laws of Bermuda, and the owner of M/V Nagara at all times relevant to these proceedings; Nagara Tam, Ltd., a wholly owned subsidiary of SCL, a limited company organized under the laws of Bermuda, and the owner of the M/V Tavara at all times relevant to these proceedings. Contender I, Ltd., a wholly owned subsidiary of SCL, a limited company organized under the laws of Bermuda, and the owner of the M/V Cavara at all times relevant to these proceedings; Strider I, Ltd. a wholly owned subsidiary of SCL, a corporation organized under the laws of Liberia, and the owner of the M/V AES Express at all times relevant to these proceedings; Strider 4, Ltd., a wholly owned subsidiary of OEH, a limited company organized under the laws of Bermuda, and the owner of M/V AES Challenger at all times relevant to these proceedings which vessel was chartered to Strider I, Ltd.

As of January 1, 1984, Brostrom Rederi AB ("Brostrom"), a Swedish shipping company and part owner of a cargo liner service known as AES, transferred AES liner service assets to Rederiaktiebolaget Transocean ("Transocean").

Arthur William Elliott who, since 1982, had had an ongoing business relationship with SCL, and Arvid Rasmussen, managing director of SCAL, proposed to SCL the purchase of the AES line and the Tavara and Nagara from Brostrom. SCL considered operating the AES liner service as a partner with Brostrom. Sherwood, however, did not wish to operate a liner service openly because it would place SCL in competition with its customers. Therefore, it was decided that corporate entities would be formed that would buy and operate the line, and SCL would initially supply the necessary funds for these purposes.

Sherwood arranged for SCL's Hong Kong attorneys, White & Case, to acquire a Hong Kong shelf company, Poudane Shipping Company, Ltd., which was renamed Elliott Maritime, Ltd. Elliott, Rasmussen and two attorneys from White & Case's Hong Kong office were made directors of Elliott Maritime, and SCL indemnified the two attorneys against any liabilities they might incur as directors. Legal fees and all funds necessary for the establishment of Elliott Maritime and for its initial capitalization were supplied by SCL. Elliott invested none of his own funds in the enterprise. All the shares of Elliott Maritime were in Elliott's name, but he executed an undated and irrevocable stock power and instrument of transfer in favor of SCL, signed an undated letter of resignation as director of Elliott Maritime and signed an undated letter addressed to White & Case authorizing the firm to transfer his shares in Elliott Maritime, which were held in the custody of White & Case, to SCL upon the request of any SCL officers.

SCL arranged for its London attorneys to set up AES, Ltd., as a wholly owned subsidiary of Elliott Maritime. SCL bore all the costs necessary for the creation of AES, Ltd. including start up costs. AES,

Ltd. was created to operate as parent and holding company of the AES liner service. Its directors were Elliott, Henry Davidson and Charles Uggla.

During the spring and summer of 1984, Elliott negotiated with Brostrom and Transocean for the acquisition of the AES liner service, and the service was acquired by AES, Ltd. in September, 1984, which included its assets, trade name and good will, at a purchase price of $5 million, less $2 million net working capital which the vendors were to leave for AES, Ltd. for two years. In addition, SCL was to purchase the Nagara and Tavara, through its subsidiaries, and these ships were to be leased to AES, Ltd. as the new operator of the liner service. AES, Ltd. was to secure the funds for purchase through a draw down on a line of credit with Irving Trust Co., the credit advanced with a guarantee from SCL. However, SCL loaned AES, Ltd. $3 million to close the transaction, but when Irving Trust's line of credit became operative, AES, Ltd. repaid SCL. The agreement provided that if the line remained in operation after September 19, 1986, AES, Ltd. would pay Transocean, over a 5-year period, the $2 million retained, plus $1 million per ship and the line was to be deemed operative unless the AES, Ltd.'s board of directors by resolution wound up the line and no sailing activity existed as of September 19, 1986.

Nagara, Ltd. and Nagara Tam, Ltd. purchased the Nagara and Tavara for $5 million each. SCL agreed to pay for the vessels for the first two years under an 8 year loan bearing 10% interest, and if AES continued in operation thereafter, Transocean was authorized to demand the balance due in cash; if AES operations were discontinued before the end of the two years, SCL was authorized to redeliver the vessel forfeiting all payments heretofore made, but without further liability on the credit sales agreement.

AES Management Corporation was incorporated in New York on April 8, 1983. AES, Inc. was incorporated in Delaware on June 8, 1984. The two corporations merged on September 19, 1984, the surviv-ing corporation being AES Management. Its name was changed to AES, Inc., a New York corporation. The board of directors of AES, Inc. on September 19, 1984, elected the same officers as those of AES, Inc., the decedent Delaware corporation: Uggla, President; Elliott, Vice President; Danielson, Secretary–Treasurer and Executive Vice Presidents, Carl E. Giseau, Edward G. Ryznan, William Fallon and John Tobin.

SCL provided loans to AES, Ltd. directly; time charters through its subsidiaries, Nagara, Ltd., Nagara Tam, Contender I, Ltd. and Strider I, Ltd.; cargo container services through SCAL and depot services through a Singapore subsidiary. AES, Ltd. had no employees, and the liner service was managed and operated by AES, Inc. AES, Ltd. paid AES, Inc. for its administrative expenses plus 4% as a fee for services. The income of AES, Ltd., aside from loans from SCL, came from the freights carried on the liner service.

AES, Inc.'s employees (about 27) in New York were the same who had operated the liner service under Brostrom and Transocean. Uggla ran the liner service operation from AES, Inc.'s New York offices, and its day-to-day operation was his responsibility. The day-to-day operation of AES, Ltd. was Elliott's responsibility.

A Steering Committee was formed consisting of Elliott, Uggla and Hume. This committee did not involve itself in the day-to-day operations of either AES, Ltd. or AES, Inc. Its function was to devise and agree upon policies best suited to the profitable operation of the liner service. Unquestionably, Hume's presence on the committee was to protect SCL's interests and financial investment in the operation, and it was unlikely that any action was taken to which Hume strenuously objected. There was uncontroverted evidence, however, that the liner service on a more or less consistent basis refused or failed to reposition SCL's empty containers which was a primary service benefit Sherwood had envisioned that SCL would obtain through the purchase of the liner service. AES, Ltd. billed SCL for this service and SCL objected to these charges as being too high.

This aspect of AES Ltd., AES, Inc. and SCL's relationship was never satisfactorily resolved.

AES, Inc. functioned as an ongoing organization. It had a financial, logistic and sales and marketing operation. It had a bank account at Irving Trust Co. out of which it paid for its supplies and operating expenses. It maintained a payroll account at Chase Manhattan Bank. On the other hand AES, Ltd. was a shell. Its sole function was to buy the liner service, and through loans and money earned on freights to finance the operation of the liner service, until it hopefully became a self-supporting enterprise.

Prior to acquisition of the liner service by AES, Ltd. on September 19, 1984, Flexi–Van had been a supplier of the liner service, and cargo containers leased from Flexi–Van had been carried on vessels operating in the service. There are three leases embracing Flexi–Van's claims in this action: Lease T003943 (T3943) dated October 16, 1978, between Uni–Flex Containers, a division of Flexi–Van, and AES, New York, New York covering the lease of 290 20′ and 40′ chassis for a term of 60 months commencing July 1, 1979, at a monthly rate of $62.36 or a daily rate of $1.05 per chassis; (Equipment leased under earlier leases was incorporated in this lease. Under its terms the lease could be extended for five years at a daily rate not to exceed $2.05 per day, if the option to do so was exercised in writing sixty days prior to expiration of the main lease.) Lease T005237 (T5237) dated July 24, 1984, between Flexi–Van Containers/ Chassis, a division of Flexi–Van, and AES, New York, N.Y. covering the lease of 289 new 20′ containers for a term of 24 months, commencing July 1, 1984, at a monthly rate of $30.42 or a daily rate of $1 per container; and Lease T005242 (T5242) dated July 16, 1984, between Flexi–Van Containers/Chassis, a division of Flexi–Van, and AES covering 100 new 23′6″ chassis for a term of 60 months commencing August 1, 1984, at a monthly rate of $103.42 or a daily rate of $3.40 per chassis.

Robert Leuce of AES telexed Robert Ong of Flexi–Van on June 1, 1984, expressing AES's intent to continue the lease (T3943) for an additional five years at $2.05 per day. The telex told Ong to arrange for a joint survey to determine if the units required refurbishing and to forward a draft of the lease so as to conclude the matter. However, the 5–year extension was not executed by either AES, Ltd. or AES, Inc., and the lease T3943 formally expired on June 30, 1984, since no formal contract of extension was executed. Yet, the equipment held under the lease was not returned to Flexi–Van at the time, and the evidence in the record shows that the parties functioned as if an extended lease had been signed.

The pending sale of the liner service was made public in various newspaper reports published on May 22, 1984. There were rumors that SCL had bought an interest in the liner service, and Flexi–Van officials sought to ascertain the truth of these rumors and accurately identify the new owner of the liner service. In June, 1984, Flexi–Van's officials from its New york office negotiated a new 2–year lease of 294 20′ containers to the liner service which were delivered July 1, 1984, and on July 9, July 17 and July 20 circulated approval sheets for a 5–year extension of T3943, T5237 and T5242 on which it was noted that William Burns, Flexi–Van's Vice President for sales and marketing had approved extension of these leases.

On July 17, 1984, Flexi–Van's Director of Credits and Collections advised Burns that credit approval was being withheld on new business with AES pending the outcome of a meeting with AES on July 19. However, Burns gave approval for lease extensions and delivery of the equipment nonetheless, despite Foley's prudence in seeking to withhold approval pending apparent expected clarification of AES's financial status at a forthcoming meeting.

On July 24, Foley reported to Ong after meeting with Uggla and Leuce of AES that since sale of the service had not been finalized, and information concerning the new shareholder was not forthcoming, that Flexi–Van should require a bank guarantee in its transactions with AES. Foley met

with Uggla on October 25, 1984, and was given a copy of the so-called letter of comfort dated October 9. This letter, signed by Uggla and Hume, advised shippers that their cargo would be delivered in the event AES was unable to fulfill its obligations under the bills of lading. Foley advised Uggla that the letter was not sufficient and left a Flexi–Van form of guarantee with Uggla. Uggla forwarded the guarantee to Hume in London and Elliott in Australia. During the summer Burns sought a bank guarantee, letter of credit or other security from AES. Foley also sought to secure a guarantee from SCL beyond the letter of comfort and continued this effort through December, 1984 without success. Thereafter, in early 1985, Flexi–Van abandoned its efforts to secure SCL's guarantee of its leases to AES.

Itel heard that the liner service had been sold to Elliott Maritime, and made credit inquiries concerning that organization. It also heard rumors that SCL was involved. There were widely circulated rumors that SCL owned AES. Itel received reports from one of its agents that a representative from Brostrom has assured him that SCL was behind Elliott and another representative had advised that Leuce of AES or an employee had indicated that SCL was in control of AES.

Itel had entered a Master Interchange Agreement, dated July 29, 1982, for the lease of dry van containers with AES identified in the lease as a Swedish corporation. On June 13, 1984, Brostrom requested that Itel consent to the assignment of the lease to AES, Ltd. Consent to assignment was refused without further financial disclosure, confirmation of insurance coverage and prompt payment of arrears due on the lease. As an alternate, Itel sought to negotiate the terms of the lease so as to secure a higher rate from AES, Ltd. to retain the equipment—the higher rate to offset the risk of not knowing AES, Ltd.'s financial status. SCL refused to guarantee a new lease with AES, Ltd. Uggla, after meeting with Itel officials on January 28, 1985, reported to Hume that Itel would negotiate a new contract with AES, Ltd. at the present rate if countersigned by SCL or at a higher rate if SCL did not countersign. In February, 1985, Itel notified Brostrom of a payment default. The account was brought current by payment to Itel on March 8, 1985, of $566,719.58. The payment was from SCL from a net working capital adjustment negotiated as part of the liner service purchase from Transocean.

On May 8, 1985, Valentine of Itel offered Uggla a new 5–year lease increasing the daily rate from $9 to $10 and subject to an increase of up to $14 per day if the lease was terminated after one year. AES refused the higher rate. Itel demanded return of its equipment and in June, 1985, instituted litigation for return of its equipment. AES, Ltd. then paid the new rate. On June 26, 1985, and August 7, 1985, John Hsieh, Itel's president, met with Sherwood and sought his help in reaching an agreement with AES, Ltd. Hume contacted Uggla and Elliott and discussed the lease's term with Hsieh. No SCL guarantee was given. A new lease, dated August 15, 1985, was entered into with AES, Ltd. for 250 20′ refrigerated containers and two generator sets commencing July 1, 1985, at a daily rate of $9 per container. The lease was for two years with option to extend it for two additional years, and it was agreed that the litigation would be discontinued.

Tex had a lease arrangement with AES dated February 28, 1984. Tex learned of the sale of the liner service and the rumors of SCL's ownership interest in AES. Tex's credit manager sought to secure solid information on AES's and Elliott Maritime's true status. Rumors were rampant concerning SCL's involvement. In June, 1984, Tex made a new lease proposal to AES. On January 25, 1985, Tex entered into new leases with AES, Ltd. with an increase of the credit line in the account. Tex offered to renew its lease on September 9, 1985, and entered into a new master lease with AES, Ltd. on September 1, 1985, and increased its credit level further.

TSEL is the successor to Cross County Leasing, Ltd. ("Cross County") acquired by Tex in April, 1986. Cross County delivered equipment for use on AES liner service in 1983 pursuant to agreement with AES. An

amendment to the existing lease with a new rate agreement was proposed on May 31, 1985. The proposal was incorporated into Lease Agreement # NA/M/025. Later Cross County agreed to supply 20 folding flat rack containers. The named lessor is AES, Suite 200, 370 Lexington Avenue, New York 10017.

The AES operation fell apart in the fall of 1985. A half million dollars loss was sustained in October, and this figure was doubled in November. AES, Ltd. was some $8 million in debt to SCL in loans, deferred charter hire and deferred container rentals. The SCL's Board, at its January, 1986 meeting, voted to extend no further financial assistance to AES, Ltd. Because AES, Ltd. could not continue without financial assistance from SCL, the AES, Ltd. Board made a determination by telephone to wind up the affairs of the organization. SCL was given formal notice on February 20, 1986, that AES, Ltd. was closing down its liner service, and the SCL shipowning subsidiaries notified AES, Ltd. promptly that the ships were being withdrawn from charter. The SCL shipowning subsidiaries sought to complete part of the voyage in which their chartered vessels were then engaged.

On April 29, 1986, AES, Ltd.'s shareholders resolved to place AES, Ltd. into voluntary liquidation. Irving Trust Co. called in SCL's guarantee on AES, Ltd.'s line of credit, and SCL assumed Irving Trust's security interest in AES, Ltd.'s assets and receivables. Some of the equipment on lease was located and notification to plaintiffs of such locations enabled them to recover much of their property.

## DETERMINATION

Since AES, Ltd. is in bankruptcy and AES, Inc. is no longer operative, plaintiffs seek to recover from SCL unpaid rental sums due on the leases up to the time of AES, Ltd.'s bankruptcy, sums due on the leases to termination of the leases and damages due for repairs which plaintiffs had to make on returned property.

Plaintiffs have presented evidence only against SCL and the vessel owners. Hence all other defendants are dismissed from the action. Plaintiffs seek to hold SCL liable for their damages under the various lease agreements on three theories: (1) that SCL was the alter ego of AES, Ltd., (2) that SCL entered into a joint venture with Arthur Elliott and/or AES, Ltd., (3) and/or that AES, Ltd. was SCL's agent. All seek to hold SCL liable as the real party in interest on the grounds that AES was merely a front for SCL or that SCL was a joint adventurer with Elliott in the purchase and operation of the liner service.

Before SCL can be held liable for AES, Ltd.'s or AES, Inc.'s debt, under an alter ego or instrumentality theory, plaintiff must establish (1) control by SCL over AES, Ltd. and/or AES, Inc. amounting to SCL's complete domination over either or both subsidiary corporations to such an extent that the subsidiaries had no separate existences or wills of their own; (2) use of such dominion to commit fraud; and (3) damage to plaintiffs as a result of abuse of such control. *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co., Inc.*, 456 F.Supp. 831, 841 (D.Del.1978); *United Rubber, Cork, Linoleum & Plastic Workers of America, AFL–CIO v. Great American Industries, Inc.*, 479 F.Supp. 216, 242 (S.D.N.Y.1979) (Duffy, J.); *Oriental Commercial & Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F.Supp. 75, 78 (S.D.N.Y.1985) (Leisure, J.); *Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, 994–95 (5th Cir.1972); *Fidenas AG, Ltd. v. Honeywell, Inc.*, 501 F.Supp. 1029, 1035 (S.D.N.Y. 1980) (Goettel, J.); *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 735 (S.D.N.Y. 1986) (Tenney, J.); *Dow Chemical Pacific, Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329 (2d Cir.1986).

In relying on this theory to hold SCL, plaintiffs must meet a heavy burden. While courts have no difficulty in applying this rationale to reach a just result and remedy fraud, related and sister corporations are presumed to be separate entities and that presumption has consistently been "given substantial weight." *Kashfi v. Philbro–Salomon, Inc., supra*, 628 F.Supp. at 733. The lack of separateness must be

clearly established by a factual showing indicating that the related, sister or subsidiary corporation has no existence of its own, is inadequately capitalized, that the formalities which are part of normal corporate existence are not present and that the dominant corporation makes personal use of the subsidiary's funds. *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984).

The courts have approached determination on a case by case basis, and it is the totality of the facts, not a single isolated factor, which tips the scale. The following are among the factors which courts have generally assessed as evidencing sufficient dominance to support the alter ego thesis. Where the dominant entity owned all the stock of the subsidiary; the two corporations had common directors and officers; the subsidiary was grossly undercapitalized and had substantially no business operations except with the dominant entity and no assets except those conveyed by the parent corporation; or the subsidiary was described by the parent as a department or division of the parent, and the parent used the property of the subsidiary as its own; the officers and directors of the subsidiary did not act independently in the subsidiary's interest but took and followed the instructions of the parent; and the normal legal requirements of the subsidiary were not observed. The totality of these factors shows such dominion and control as to render the subsidiary an instrumentality or alter ego of the entity against whom liability is being sought. *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, 301 F.Supp. 64, 67–68 (S.D.N.Y.1968) (Tenney, J.).

██ It is true that Elliott Maritime was created by SCL for the purpose of erecting a corporate structure to provide entry into the liner service without SCL's open or direct involvement. It is also true that AES, Ltd. is Elliott Maritime's wholly owned subsidiary. Sherwood testified that the purpose of Elliott Maritime's and AES, Ltd.'s existence was to enable SCL to do indirectly what it did not wish to do directly, that is, operate a liner service. It is also true that AES, Ltd. bought the liner service with funds supplied by SCL in the form of a loan. SCL was responsible for effectuating AES, Inc.'s corporate structure; and its subsidiary shipowning corporations enabled the liner service to operate. These facts, however, are not in themselves sufficient to make Elliott, AES, Ltd. or AES, Inc. SCL's instrumentalities or its alter ego.

One of the purposes of incorporation is to avoid personal liability. *Gartner v. Synder*, 607 F.2d 582, 586 (2d Cir.1979). That SCL used corporate structures to carryout Sherwood's plans to enter a liner service operation without SCL being directly involved or exposed is not per se enough to render the vehicles created to achieve that objective instrumentalities or alter egos of SCL. This is so, even though it could be argued that SCL was in effect AES, Ltd.'s sole shareholder. Elliott Maritime, Ltd., wholly owned by Arthur Elliott, held all the shares of AES, Ltd. Thus Arthur Elliott was in fact ostensibly the sole shareholder of AES, Ltd. However, he in turn had signed undated share transfer documents giving SCL authority at its discretion to take over Elliott's shares. Thus, SCL was the putative, if not actual, holder of AES, Ltd. shares. However, stock ownership alone is insufficient to charge one corporation with the torts of a subsidiary. *Noto v. cia Secula di Armenento*, 310 F.Supp. 639, 646 (S.D.N.Y.1970) (Weinfeld, J.). Nor is SCL's putative stock ownership along with its activities in establishing and making possible the operation of the liner service sufficient to establish its dominance of AES, Ltd. or AES, Inc. The evidence must establish that AES, Ltd. and/or AES, Inc. was controlled by SCL and used as a sham, decoy or conduit to defraud or defeat the rights of third parties. Even if dominion and control were established, there is no such evidence of any SCL wrongdoing in this case.

SCL was a major creditor of AES, Ltd. and entitled to share in any profits if the operation was successful. However, there is no evidence that SCL officials ran or controlled the day-to-day operations of AES, Ltd. or AES, Inc. A Steering Committee consisting of Uggla, Elliott, Hume

and Rasmussen had something akin to general oversight over AES, Inc.'s activities. Through Hume's presence on the Steering Committee SCL sought to protect its investment in the liner service operations. Uggla testified that the idea of the Steering Committee was his, and that the selection of its members was a joint decision made by him and Elliott. There is nothing in the record to dispute this testimony.

Of course, it could be argued that these two men were SCL's puppets since both had to know that SCL and Sherwood possessed the real authority. While plaintiffs have presented no proof to this effect, assuming the circumstances allow such an inference, there are no facts in the record to show that Hume ever ordered the Steering Committee to have AES, Ltd. or AES, Inc. make any decision or to execute any order emanating from SCL. Hume as a member of the Steering Committee made suggestions for improving and making AES, Inc.'s office operations more efficient, but direct oversight of the liner service was Uggla's and Elliott's responsibility. The day-to-day control of the liner service was in Uggla's hands and the day-to-day operation of the liner was the responsibility of AES officials.

Sherwood testified that he and Hume wanted Uggla removed as president of AES, Inc., but Elliott wanted him to stay on, and he did. SCL was greatly disappointed because SCL conceived one of the benefits of the liner service was that its empty containers would be repositioned more cheaply and efficiently and more regularly to ports where they were needed. However, AES, Ltd. had the problem of repositioning its own leased containers, and a higher priority was placed on repositioning its own leased containers than on SCL's. Therefore, from time-to-time AES failed to reposition SCL's empty containers, and when it did provide SCL with this service its charges were higher than SCL's though reasonable.

The standard for establishing AES, Ltd. as an instrumentality or alter ego of SCL has not been met on the issue of domination and control. Moreover, there is no evidence whatsoever to show that SCL utilized AES, Ltd. or the liner service to perpetrate a fraud on plaintiffs.

■ There is simply nothing in the record to support plaintiffs' alternative thesis—that AES, Ltd. and/or AES, Inc. were SCL agents. The standard required to establish an agency relationship between SCL and AES is the same as that required to pierce the corporate veil—abuse of control. *Kashfi v. Philbro–Salomon, Inc., supra,* 628 F.Supp. at 735.

■ Plaintiffs' joint venture theory fares no better. The requirements for a joint venture are (1) a specific agreement to engage in a joint venture for profit; (2) the agreement must manifest the intent of the parties to join together in a joint venture; (3) each principal of the venture must make a contribution of property, financial resources, effort skill or knowledge; (4) there must be some degree of joint proprietorship and control of the enterprise; (5) and there must be some provision for the sharing of profits and losses. *Flammia v. Mite Corp.,* 401 F.Supp. 1121, 1127 (E.D.N.Y.1975), *aff'd* 553 F.2d 93 (2d Cir.1977). The agreement may be oral and can be inferred from the conduct of the parties in the performance of the joint enterprise. *Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1105 (E.D.N.Y.1985), *aff'd,* 800 F.2d 1128 (2d Cir.1986); *Holloran v. Ohlmeyer Communications Co.,* 618 F.Supp. 1214, 1218 (S.D.N.Y.1985) (Conner, J.).

The intent of the parties is critical, and determination of that intent is the first step to a joint venture analysis. There was certainly nothing said by Elliott or Sherwood or any other SCL official as reported on the record to manifest an intent by Elliott and SCL to engage in a joint venture. There is no written or, evidence of, any oral agreement to that effect. It is not enough that the parties agree to act in concert. There must be in addition a commingling of property, profits or other interests which the parties hold jointly and which are made accessible to each under the confidential relationship that exists between them. The right of mutual control is

an essential element of a joint venture, but there need not be mutual control of every aspect of the venture—sole control of some aspects may be entrusted to a co-adventurer, *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.,* 611 F.Supp. 665, 679 (D.N.J.1985), but there must be some dominion left to the other co-adventurers to provide mutuality of authority over the operation.

Joint control, sharing of profits and losses, a combination of property, skill and knowledge and joint control on management of assets are essential elements. The absence of any one of these four elements is fatal. *Precision Testing Laboratories, Ltd. v. Kenyon Corp. of America,* 644 F.Supp. 1327, 1345 (S.D.N.Y.1986) (Cooper, J.).

It has been said that defining a joint venture is easier than identifying one. The facts are determinative, "each case depends upon its own facts." *Yonofsky v. Wernick,* 362 F.Supp. 1005, 1030 (S.D.N.Y. 1973) (Edelstein, J.) (quoting *Backus Plywood Corp. v. Commercial Decal, Inc.,* 208 F.Supp. 687, 690 (S.D.N.Y.1962), *modified,* 317 F.2d 339 (2d Cir.), *cert. denied,* 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963)). Elliott contributed no finances. He did bring knowledge and skill about commercial maritime matters to the operation. There was no joint control of the Elliott Maritime, AES, Ltd. or AES, Inc. by SCL and Elliott. Elliott through AES, Ltd. bought the liner service from Transocean and through SCL subsidiaries the Nagara and Tavara were bought and then chartered back to AES, Ltd. Thus AES liner service formerly run by Brostrom and Transocean continued to function under new ownership in much the same way it had been before the transfer of ownership.

The corporate form alone, however, would appear to negate a joint venture finding in this case, *Realco Services, Inc. v. Holt, et al.,* 513 F.Supp. 435, 442 (E.D.Pa. 1980), *aff'd,* 671 F.2d 495 (3d Cir.1981), and relegate the parties to whatever rights they may possess as stockholders, directors, etc. since one cannot simultaneously be a joint venturer and a corporate

stockholder. *Tow v. Moore,* 24 A.D. 2d 648, 649, 262 N.Y.S.2d 134, 137 (2d Dep't. 1965).

The corporate form was chosen to shield SCL from personal liability so that SCL could be protected from any losses other than the funds it might be required to contribute to make the operation viable. Since that is a prudent way to structure business enterprises, there is no reason for the structure not being given effect in this case, absent justification being provided for ignoring the corporate form.

AES, Ltd. was essentially a separate and distinct entity apart from SCL. SCL left direct oversight, day-to-day control and day-to-day operation of the liner service to Elliott, Uggla and AES officials. SCL never interfered with the management of AES or sought to make decisions for AES or to supercede any decision made by AES. Under those circumstances a court must proceed with extreme caution. As a general rule, separate corporations will not be regarded as a single entity so as to be held responsible for the acts or obligations of the others, even when the parent has the ability to control its wholly owned subsidiary. *Whayne v. Transportation Management Service, Inc.,* 252 F.Supp. 573, 577 (E.D.Pa.1966), *aff'd,* 397 F.2d 287 (3d Cir.), *cert. denied,* 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 438 (1968). Only when "the parent chooses to exploit its dominant position ... and become so involved and intertwined in [the subsidiary's] activities that a Court will disregard corporate formalities and hold the parent liable for the obligations of its subsidiary," *United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO v. Great American Industries, Inc., supra,* 479 F.Supp. at 242, or there is such unity of interest and ownership that the separation of the corporations no longer exists and failure to disregard form would result in injustice. *Oriental Commercial & Shipping Co., Ltd. v. Rosseel, N.V., supra,* 609 F.Supp. at 78.

There was certainly a financial relationship between AES, Ltd. and SCL. SCL loaned in excess of $3 million to AES, Ltd. to enable it to buy the AES liner service.

SCL deferred the collection of charter hire and container rentals. The purchase price for the liner service was measured by the net working capital in the company which Transocean represented to be in excess of $5 million. An audit in 1984, however, revealed that net working capital to be a negative $800,000. After negotiations, Transocean agreed to return the $6 million working capital shortfall to AES, Ltd. Transocean insisted that the $6 million be given to SCL and applied to liquidate unpaid debts which were incurred pursuant to contracts in which Transocean still was a signatory. SCL received the funds and utilized much of the $6 million to pay the debts AES, Ltd. had incurred in respect of the operation of liner service. Among the outstanding bills paid were those due plaintiffs. SCL did not use any of these funds to liquidate AES, Ltd.'s debt to it in container rentals and charter hire, although it did liquidate its loan to AES, Ltd. out of these funds.

Plaintiffs point to evidence that SCL paid for bunkers for AES, Inc. liner service as evidence that SCL was funding AES, Ltd. business. SCL contends that it paid for the bunkers in decreasing amounts during AES, Ltd.'s first six months operation, but that beginning July, 1985, AEs, Ltd. took a responsibility for these items and that SCL resumed such payments in 1986 as shipowner of the vessels under charter to AES, Ltd. to prevent seizure of the vessels for nonpayment of oil bills and to insure an adequate supply of fuel to the vessels. In addition, it contends SCL's expertise and experience put it in a more advantageous position to secure better quality bunkers and more economically than AES, Ltd. could have. The payment for bunkers does not supply the missing element validating any of the theories pursuant to which plaintiffs seek to place liability on SCL for their damages.

Plaintiffs were neither misled, misinformed, nor defrauded. When the AES liner service was sold by Brostrom–Transocean to AES, Ltd., plaintiffs heard rumors, all unconfirmed, of SCL's involvement. They sought but secured no guarantee that any indebtedness which AES, Ltd. or AES, Inc. owed to them would be ultimately paid by SCL. SCL did give assurances in a document signed by Uggla and Hume that any cargo on the SCL's vessels chartered to the liner service would be delivered. This document was of no benefit to plaintiffs as suppliers of rental chassis and containers. Nonetheless, each plaintiff decided to continue the rental of its equipment to the liner service now under new ownership either by authorizing extension of the old leases or by new leasing conditions. The steps were taken in sole reliance on AES, Ltd.'s financial stability.

Plaintiffs' theories for liability—joint venture, agency, alter ego or instrumentality—are, to paraphrase the court in *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 413 (7th Cir.1988), variations on a theme that the corporate status of AES, Ltd., and AES, Inc. should be disregarded to reach SCL as the real obligor. Unless there is some evidence produced which "misled [the plaintiffs] into thinking they were dealing with another entity, there simply is no need to 'protect' them." *Id.* at 415–16. The plaintiffs chose to deal with AES, Ltd. and AES, Inc., and now "to allow them access to [SCL] when the deal goes sour is to give them more than the benefit of their bargain." *Id.* at 416.

Plaintiffs are established business enterprises and sophisticated commercial entities. They know how to become informed about the financial condition of the corporations with which they deal. The evidence is uncontroverted that each plaintiff sought to verify SCL's position in the enterprise. However, they never verified any facts to show that SCL was the silent partner or concealed owner of AES, Ltd. or AES, Inc. Nonetheless, they decided to do business despite the fact that SCL refused to provide any guarantee that AES, Ltd. obligations were indemnified by SCL or any assurance that AES, Ltd.'s creditors could look to SCL for payment in the event of default. Itel sought to guarantee against the risk of dealing with AES, Ltd., an unknown commodity, by contracting for a higher rate. But all chose to deal with

AES, Ltd. knowing that SCL was refusing to expose itself to responsibility. The last ditch argument plaintiffs make for disregarding AES, Ltd.'s and AES, Inc.'s corporate status is the contention that SCL siphoned off funds which were due to AES, Ltd., thereby bringing on its bankruptcy and liability to meet its obligations to them. However, the record fails to provide support for this contention.

SCL wanted to hide its involvement in AES, Ltd. and AES, Inc. because of concern about jeopardizing SCL's relationship with other liner service companies that were SCL's customers. Plaintiffs were among those learning of SCL's involvement with AES. However, to paraphrase *Realco Services Inc. v. Holt, supra,* 513 F.Supp. at 443, to accept plaintiffs' conclusion that AES, Ltd. was an agent of SCL or that SCL was a joint venturer with Elliott Maritime and that the plaintiffs' reliance on this conclusion creates an agency or joint venture relationship would substitute the plaintiffs' understanding for the understanding of SCL, AES and Elliott Maritime, the parties to the alleged agency or joint venture relationship.

■ There has been no showing of fraudulent use of the corporate form to justify a disregard of the corporate entity. Plaintiffs dealt with AES, Ltd. with knowledge that they could not look to SCL. There were no misrepresentations by SCL or any of its offices, directors or executive employees to induce plaintiffs to expose themselves to the risk of doing business with AES, Ltd. on the expectation of being able to rely on SCL if AES, Ltd. faltered in its obligation.

Plaintiffs allege that the handling and timing of the settlement dispute with Transocean concerning a working capital deficiency which was owed to AES, Ltd. contributed to AES's liquidation. Transocean paid the amount of $6.2 million to SCL. The agreement on the amount due was reached on March 1, 1985. Plaintiffs contend that it was only after the risk of losing the payment of the $6 million that the decision was made to terminate AES, Ltd. What caused the decision to termi-

nate was SCL's decision to extend no further credit to the AES, Ltd. SCL invested a considerable amount of money into AES, Ltd. SCL was under no obligation to take steps to jeopardize its recoupment of as much of what it had invested in order that plaintiffs would benefit.

Plaintiffs also complain about business decisions made by SCL in turning down prospective purchasers of the line which would have been beneficial to AES, Ltd. and its creditors, other than SCL. SCL is charged with responsibility for the liner service not being sold to third party prospects. Flexi–Van argues that one potentially beneficial sale did not go through because sale of the line could have precluded the right of SCL to return the Navara and Tavara to Transocean. SCL was under no obligation to agree on a business transaction that was unprofitable or not beneficial to it.

Plaintiffs contend that AES could not change major agents, services or renters without Steering Committee approval, and that the Steering Committee had to approve any substantial AES business commitment or the hiring and firing of key personnel. Elliott and Uggla served on the Committee along with Rasmussen and Hume. It was certainly clear that Hume was on the committee as an SCL watchdog, to protect SCL's investment. According to the members of the Committee they sought to reach consensus, and Elliott and Uggla were not taking orders from Hume. At any rate, there is no evidence that corporate form was disregarded. The Steering Committee would reach certain conclusions which would be effectuated by action of the directors of AES, Ltd. or AES, Inc. or by Uggla and Elliott as officers. There is no evidence that Hume had any say in the day-to-day operations of AES, Ltd.

All the contentions plaintiffs make are make weight arguments. They made a bad deal but did it with their eyes open and without any encouragement from SCL, and under the apparently mistaken assumption that SCL would bail them out, if the AES operation failed. That assumption was bad

judgment on plaintiffs' part for which they, not SCL, must accept responsibility.

Accordingly, the complaints of Itel, Flexi–Van, Tex and TSEL are all dismissed and judgment is entered in favor of the defendants. Defendants are entitled to their costs.

IT IS SO ORDERED.