**Joseph ROSEN and Sandra McNeil, Plaintiffs,**

v.

**HYUNDAI GROUP (KOREA), Hyundai Corporation and Hyundai Piano; Samick (Korea), Samick (America) and Samick Music Corp., Defendants.**

**No. CV 90–3674.**

United States District Court, E.D. New York.

Aug. 10, 1993.

Yannacone & Yannacone by Victor John Yannacone, Jr., Patchogue, NY, Thomas V. Dana, Co–Counsel, New York City, for plaintiffs.

Reid & Priest by Laura Longobardi, New York City, for defendant Hyundai.

Paul A. Batista, New York City, for defendant Samick Music Corp.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Joseph Rosen, Sandra McNeil, Family Melody Center of Patchogue, Inc. and Schumann International Inc., (collectively "plaintiffs") distributed the Schumann brand piano manufactured by defendant Samick Musical Instruments Corporation ("SMIC") and sold to them by defendant Hyundai Corporation ("Hyundai") who acted as a middleman for plaintiffs and SMIC. Plaintiffs brought a slew of antitrust and state law claims stemming from their termination as a distributor of SMIC-manufactured pianos. Presently before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion for summary judgment with respect to plaintiffs' antitrust claims is granted. Additionally, summary judgment is also granted with respect to all state claims except plaintiffs' breach of warranty claim.

## I. BACKGROUND

This is one of the many cases in which a terminated . distributor of goods alleges a

myriad of antitrust claims and state law based tort claims flowing from its termination. Unfortunately, plaintiffs' amended complaint and memorandum of law are rambling and disjointed, making it exceedingly difficult to decipher plaintiffs' claims.

Plaintiffs were involved in the wholesale distribution of pianos to dealers located in the United States. SMIC is a Korean Corporation that manufactures pianos.[1] Defendant Samick (USA) is a California corporation whose principal business is the wholesale distribution of SMIC-manufactured pianos under the trade name Samick. SMIC owns 80% of the shares of Samick (USA). The remaining 20% is owned by Kyo Chu, who is the president of Samick (USA) and one of the managing directors of SMIC.[2]

Hyundai is a large-scale Korean trading company. Defendant Hyundai (USA) is a wholly-owned subsidiary of the Hyundai Corporation that accepts orders from Hyundai's customers in the United States as well as parts of Latin and South America.[3] From approximately 1979 until 1990, Hyundai acted as a middleman for plaintiffs and SMIC, purchasing SMIC-manufactured pianos under the trade name Schumann and reselling them to plaintiffs. Plaintiffs never entered into a written contract with Hyundai nor did plaintiffs have any contract with SMIC for a continuous supply of Schumann pianos. Indeed, plaintiffs had no direct dealings with SMIC whatsoever. In addition to its role as a middleman, Hyundai also purchased pianos from SMIC under the trade name Hyundai and distributed these pianos directly in the United States wholesale market.

The relationship between SMIC and plaintiffs was rocky from the outset. SMIC constantly threatened to terminate plaintiffs' supply of Schumann brand pianos and towards the end of the relationship broadcast its intent to terminate plaintiffs to dealers in the trade. It also appears that Hyundai attempted to convince SMIC on many occasions not to terminate plaintiffs, apparently because it was in Hyundai's economic interest to continue acting as a middleman for SMIC and plaintiffs.[4] Additionally, plaintiffs also allege that large quantities of pianos were purposefully delivered in defective condition and that defendants failed to cure the defects.

In their complaint, plaintiffs allege that SMIC, Samick (USA), Hyundai and Hyundai (USA) entered into an agreement to terminate plaintiffs as distributors of the SMIC-manufactured Schumann brand piano because plaintiffs refused to raise their prices. SMIC contends that it unilaterally decided to terminate plaintiffs as part of its overall sales strategy. It claims that plaintiffs sold the Schumann pianos cheaply and as a result failed to provide its customers with any after-sales services. According to SMIC, people in the trade were aware that SMIC manufactured the Schumann brand pianos and SMIC was concerned that the reputation of its pianos would be injured as a result of plaintiffs' discounting.

Plaintiffs, on the other hand, claim that SMIC terminated them as distributors because of pressure placed upon it by Hyundai. Plaintiffs speculate that Hyundai, who competed against plaintiffs at the distributor level, pressured SMIC to terminate plaintiffs because plaintiffs refused to raise their prices. Plaintiffs suggest that Hyundai exercised control over SMIC because of its position as one of SMIC's largest customers. Plaintiffs further contend that Samick (USA) was also in favor of their termination because it too competed against plaintiffs at the distributor level.

In addition to the alleged price-fixing scheme, plaintiffs also allege that defendants

---

1. It should be noted that SMIC has not been served in this case.

2. SMIC and Samick (USA) will collectively be referred to as the "Samick defendants".

3. Hyundai and Hyundai (USA) will collectively be referred to as the "Hyundai defendants".

4. Although all the documentary evidence is to the contrary, plaintiffs suggest that the Hyundai defendants did not really attempt to convince the Samick defendants to continue supplying plaintiffs. Rather, plaintiffs speculate that the two groups of defendants engaged in a "good cop/bad cop" charade, whereby the Hyundai defendants only pretended to try to convince SMIC to continue supplying plaintiffs.

unlawfully agreed to boycott plaintiffs, so that they could take over plaintiffs' customers and thereby increase their own profit. Plaintiffs also alleged a Robinson–Patman Act violation and monopoly claim which they withdrew at oral argument. Finally, in their complaint, plaintiffs allege a variety of state-law based torts. At oral argument they withdrew their common law monopoly claim, their prima facie tort claim, their refusal to deal claim, and their restraint on alienation claim. The remaining state claims are for unjust enrichment, joint venture, promissory estoppel, tortious interference with business relations and breach of warranty.

## II. DISCUSSION

### A. *Federal Antitrust Claims*

#### 1. *Section 1 Claims Vertical Price–Fixing Claim*

■ Plaintiffs allege that the Hyundai defendants entered into an illicit price-fixing agreement with the Samick defendants in violation of § 1 of the Sherman Antitrust Act.[5] Vertical price-fixing schemes are considered *per se* illegal under the antitrust

laws. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). In order to succeed on the merits of their claim, plaintiffs need only prove that the Hyundai defendants on the one hand and the Samick defendants on the other hand entered into an agreement to fix prices.[6] Because vertical price-fixing is a *per se* violation of the antitrust laws, plaintiffs do not have to allege or show how the agreement adversely affected interbrand competition in the relevant product and geographic market.[7]

According to plaintiffs, Hyundai (USA) and Samick (USA) competed with them at the distributor level and were unhappy with plaintiffs' discounting. Thus, plaintiffs allege that Hyundai, who exercised economic power over Samick by virtue of its position as one of Samick's largest customers, coerced SMIC into terminating plaintiffs. Hyundai strenuously denies plaintiffs' assertion and suggests that contrary to plaintiffs' allegation, it attempted to convince SMIC to continue supplying pianos to plaintiffs. Indeed, Hyundai argues that it was to its economic benefit to continue acting as middleman for plaintiffs.[8]

---

**5.** § 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce ...."

**6.** The only actionable agreement that plaintiffs could assert involving the Hyundai defendants would be between the Hyundai defendants collectively and the Samick defendants. As Hyundai (USA) is a wholly owned subsidiary of Hyundai, the Hyundai defendants are legally incapable of conspiring with each other for the purposes of § 1. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771–77, 104 S.Ct. 2731, 2741–45, 81 L.Ed.2d 628 (1984) (because corporate parents and their wholly owned subsidiaries have "a complete unity of interest.... the very notion of an 'agreement' in Sherman Act terms between a parent and wholly owned subsidiary lacks meaning").

Moreover, the same rationale that prevents a parent and wholly owned subsidiary from conspiring with each other for the purposes of the antitrust laws, also prevents Samick (USA) from conspiring with SMIC. Although SMIC only owns 80% of Samick (USA), the remaining 20% is controlled by one of its managing directors. Under these facts, this Court concludes that there is "a complete unity of interest" between SMIC and Samick USA making an agreement between them meaningless in Sherman Act terms.

**7.** The Samick defendants argue that because the complaint alleges a vertical restriction on trade, the rule of reason is the proper analysis to be applied to this case. Although the recent trend in antitrust law favors rule of reason analysis over the *per se* approach, the Supreme Court has not adopted the rule of reason in the context of vertical price-fixing schemes. Rather, the Supreme Court continues to hold that vertical price-fixing is *per se* illegal.

Moreover, Samick's reliance on cases that suggest that vertical non-price-fixing restraints should be analyzed under the rule of reason is misplaced. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Here, plaintiffs allege a price-fixing scheme. In *Sylvania*, the plaintiffs claimed that Sylvania violated § 1 "by entering into and enforcing franchise agreements that prohibited the sale of Sylvania products other than from specified locations." *Id.* at 40, 97 S.Ct. at 2552. Thus, the plaintiffs in *Sylvania* did not allege, as plaintiffs do here, that the defendants entered into price-fixing agreements.

**8.** This Court is uncertain whether it was to Hyundai's economic benefit to continue supplying pianos to plaintiffs. Because Hyundai competed against plaintiffs at the wholesale level, plaintiffs' termination as a distributor may have benefited Hyundai.

Moreover, SMIC claims that it unilaterally decided to terminate plaintiffs. SMIC argues that plaintiffs' discounting was having a deleterious effect on its reputation in the industry. By failing to provide any after-sales services to its customers, SMIC argues that plaintiffs were undermining its sales plan of providing a top-notch product.

The Supreme Court has enunciated clear and stringent evidentiary standards for plaintiffs to show the required agreement under the antitrust laws. In order to survive a motion for summary judgment, plaintiffs must come forward with unambiguous evidence that the Samick defendants and the Hyundai defendants entered into an agreement to terminate plaintiffs and to sell their products thereafter at specific price levels. *See Business Elecs. Corp.*, 485 U.S. at 726, 108 S.Ct. at 1520 (1988); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Further, that evidence must tend to exclude the possibility that the Samick defendants and Hyundai defendants acted independently. *See Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). Plaintiffs have simply failed to meet this standard. The record in the present case is bereft of any evidence that tends to show any agreement on prices or price levels among defendants.

Defendants have met their initial burden of showing a lack of agreement between the defendants. The affirmative evidence indicates that there was clear disagreement between the Hyundai defendants and SMIC concerning plaintiffs. Indeed, the uncontroverted evidence in this case suggests that Hyundai opposed, not supported SMIC's decision to terminate plaintiffs. *See* Lim Dec. ¶¶ 11–16, 21–22, 24–25, 34, 36, 38, and Exhs. 2–3, 8–10, 14–15, 25, 28–29; Joo Dec. ¶¶ 17, 26. Plaintiffs have offered only sheer speculation to meet their burden to present evidence that shows an agreement or "that tends to exclude the possibility that the [defendants] acted independently." Thus, Rosen summarized his "evidence" that the

Hyundai defendants agreed to fix prices with SMIC as follows:

> I was threatened that, if I did not raise my prices, that Samick would discontinue my supply. This is what Hyundai told me. *I have no way of knowing whether Hyundai—I have to assume at this point that Hyundai was involved in that also....*

Rosen Dep. at 774 (emphasis added).

The apparent basis for plaintiffs' assumption that SMIC and Hyundai must have conspired is Rosen's speculation that Hyundai had sufficient economic power to force SMIC to adhere to its wishes. *See* Rosen Dep. at 84, 99, 188, 309–310, 550, 559–60, 607, 731 and 744. Such speculative evidence of conspiracy, however, is insufficient to defeat a motion for summary judgment in a dealer termination case.

In *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981), the plaintiff put forth evidence that a competing distributor was a major customer of the manufacturer. *Id.* at 79–80. The plaintiff urged that the competitor, by virtue of being an "important customer" of the manufacturer, has some "economic power" to compel the manufacturer to terminate the plaintiff's distributorship. *Id.* at 80. The Second Circuit found that this "evidence" rested on "sheer speculation insufficient to support a conclusion that [the defendants] engaged in an illegal [agreement]." *Id.* *See also H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1016 (2d Cir.1989); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923–25 (2d Cir.1985).

In sum, under the controlling Supreme Court and Second Circuit precedents, plaintiffs can avoid summary judgment with respect to their claim of vertical price-fixing only if they can show unambiguous evidence of an agreement among the defendants to fix prices. Since plaintiffs rely on only speculation that such an agreement exists, their vertical price-fixing claim cannot survive and is hereby dismissed.

## 2. Group Boycott Claim

█ In addition to the price-fixing claim, plaintiffs also raise a second § 1 claim based on an alleged agreement between the Hyundai defendants and the Samick defendants not to deal with plaintiffs in an effort to drive them out of business and take over their customers. Boycotts traditionally fell into a category of *per se* unlawful conduct requiring proof only of an agreement between defendants. *See United States v. General Motors Corp.*, 384 U.S. 127, 140, 86 S.Ct. 1321, 1327, 16 L.Ed.2d 415 (1966); *Klor's Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959). In recent years, however, the Supreme Court has required a plaintiff alleging a non-horizontal boycott to show, in addition to such an agreement, that the defendants have market power in the relevant market.[9] *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 290–98, 105 S.Ct. 2613, 2617–22, 86 L.Ed.2d 202 (1985). Absent market power, the plaintiff must proceed under the rule of reason.

Plaintiffs' claim of an unlawful boycott by the defendants, whether analyzed under a *per se* or rule of reason approach, fails for the same reason that their price-fixing claim fails. Plaintiffs have no more evidence to show that the defendants agreed to refuse to deal with plaintiffs than they have to show that defendants entered into a price-fixing agreement. On this ground alone, defendants' motion for summary judgment must be granted.

█ Moreover, although attempting to allege a *per se* violation, plaintiffs have failed to show that defendants have sufficient market powers to warrant *per se* treatment. Plaintiffs do not identify a relevant market in which competition was harmed. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Both plaintiffs and defendants agree that the relevant geographic market in this case is the United States. The parties disagree, however, over the proper definition of the relevant product market. The product market must be plausibly defined according to the traditional "methodology courts prescribe to define a market for antitrust purposes an analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products." *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982). Simply put, goods are in the same relevant product market if they are reasonably interchangeable for the purposes for which they were produced.

█ Plaintiffs' proposed product market, which defines the market as that for the sale of SMIC-manufactured pianos, is patently unreasonable. Plaintiffs offer no rational explanation to support such a definition. If such a definition was allowed to stand, all manufacturers would have absolute monopoly power in the relevant product market, since by definition they control the total output of their own products. The case law is clear that such a market definition is untenable. *See Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 678 (S.D.N.Y.1987); *Gianna Enters.*, 531 F.Supp. at 1354; *Morse v.*

9. Plaintiffs argue that any agreement between the Hyundai defendants and the Samick defendants to boycott plaintiffs should be viewed as horizontal. Plaintiffs' theory evidently is that goods made by the same manufacturer compete "horizontally" if they bear different trade names and are sold by different distributors. Plaintiffs offer no case law to support this characterization.

In *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), the defendant Whirlpool manufactured vacuum cleaners that were sold by the plaintiff under the brand name "Whirlpool" and sold by Sears, another distributor, under the brand name "Kenmore." The plaintiff argued that this market structure rendered the competition between Sears and the plaintiff "horizontal," because as a result of the plaintiff's termination, "competition of both an interbrand and intrabrand nature was eliminated." *Id.* at 131 n. 6. The Second Circuit, however, rejected this argument, holding that the existence of multiple brands sold by different distributors "does not *ipso facto*, convert this case into a horizontal conspiracy warranting per se treatment." *Id.* at 131. Likewise, the existence of multiple trade names here does not transform the vertical nature of this case. This is especially so where the purported agreement is between the manufacturer of goods and another distributor.

*Swank, Inc.*, 493 F.Supp. 110, 115 (S.D.N.Y. 1980).

Defendants' definition of the relevant product market, all pianos (except high quality professional models) manufactured for sale in the United States, is more plausible. Under this definition, the Hyundai defendants' market share for sales of pianos in the United States in less than 2%, while the Samick defendants' market share has never been more than 11%. Because defendants clearly do not have market power in the relevant market, plaintiffs' boycott claim must be analyzed under the rule of reason.

■ In order to survive summary judgment under the rule of reason, plaintiffs would have to show, in addition to an agreement between defendants not to deal, an adverse affect of the agreement on *interbrand* competition in the relevant market. *See Schwartz v. Jamesway Corp.*, 660 F.Supp. 138, 141 (S.D.N.Y.1987). Plaintiffs do not attempt to explain how defendants' purported boycott agreement could in any way affect interbrand competition in the United States piano market. Indeed, none of the defendants have sufficient power in this market to sustain a boycott claim under the rule of reason. *See Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*, 791 F.Supp. 956, 965–67 (N.D.N.Y.1992) (In order to show an adverse affect on interbrand competition, plaintiffs must demonstrate that defendants have market power in the relevant market.). Thus, even if there were evidence of an agreement between the defendants to boycott plaintiffs, plaintiffs boycott claim would still have to be dismissed.

B. *State Law Claims*

1. Promissory Estoppel

■ Although plaintiffs did not have a written contract with any of the defendants for a continuous supply of Schumann brand pianos, they seek to recover for their termination under a promissory estoppel theory. Under New York law, in order to recover for promissory estoppel, a plaintiff must show that there was an unambiguous promise, that plaintiff reasonably relied on that promise and that plaintiff was injured as a result of

that reliance. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir.1984). Additionally, the claim of promissory estoppel, even if established, is further subject to the defense of the Statute of Frauds. *See D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 99 A.D.2d 522, 471 N.Y.S.2d 299, 302 (2d Dep't 1984).

■ According to plaintiffs, even though SMIC repeatedly threatened to terminate their supply of Schumann pianos and even though plaintiffs requested and were denied a written contract for a continuous supply of pianos, defendants are liable to them for their termination under a promissory estoppel theory. Plaintiffs appear to rely on a series of correspondence between Hyundai and themselves wherein Hyundai stated that they would do everything possible to assure the continuous supply of Schumann pianos. This correspondence, however, cannot be viewed as an unambiguous promise for the continuous supply of pianos. At the most, the letters suggest merely that the Hyundai defendants would attempt to do what they could to convince SMIC to supply pianos. Such an undertaking is hardly an unambiguous promise to plaintiffs assuring an indefinite supply of SMIC-made pianos. *See R.G. Group, Inc.*, 751 F.2d at 79.

■ In any event, even if Hyundai had promised plaintiffs an unending supply of pianos, given that plaintiffs were well aware of SMIC's stated intention to terminate them, it is difficult to see how plaintiffs could have reasonably relied on such a promise. Moreover, because Hyundai was only a middleman and not the manufacturer reliance on Hyundai's promise would have been unreasonable. Furthermore, and equally fatal to plaintiffs' claim, they have not shown any reliance injury. Plaintiffs suggest that they opened up certain letters of credit in anticipation of receiving pianos. However, the opening of letters of credit concededly did not injure plaintiffs, for as Rosen stated at his deposition, plaintiffs received every piano for which they opened a letter of credit. *See* Rosen Dep. at 676–78. Plaintiffs also point to the sale of their business as some indication that they were harmed by their termination. However, nowhere in their volumi-

nous papers do plaintiffs suggest that the sale was for anything other than fair market value.

■■■ Finally, even if plaintiffs could establish the elements of promissory estoppel, they still have set forth no facts to avoid the application of the Statute of Frauds. Under New York law, the Statute of Frauds is a proper defense to a claim of promissory estoppel as long as its application is not unconscionable. *See D & N Boening, Inc.,* 99 A.D.2d 522, 471 N.Y.S.2d at 302. Under settled principles of New York law, there is no unconscionability in invoking the Statute of Frauds in a situation where a distributor who has been terminated already has received substantial benefits from the distributorship. *See Id.* Here, plaintiffs admittedly received substantial benefits from their distributorship. Thus, application of the Statute of Frauds cannot be avoided. Accordingly, plaintiffs claim for promissory estoppel must be dismissed.

2. Business Disparagement, Product Disparagement and Tortious Interference with Prospective Economic Advantage

■■■ Plaintiffs bring a welter of state claims all based on the allegation that defendants spread false rumors about the quality of the Schumann piano in order to steal away plaintiffs' customers. When pressed at oral argument to support these claims, plaintiffs relied on the testimony of a single customer who stated that sometime in 1983 an unidentified Samick (USA) employee made untrue disparaging remarks about the Schumann brand piano. It is clear that under New York law, a claim that is bottomed on libel has a one year statute of limitation. *See* N.Y.Civ.Prac.L. & R. § 215 (McKinney 1990). Because this case was commenced way beyond the one year statute of limitation, all state claims based on this alleged libel must be dismissed.

3. Unjust Enrichment

■■■ Plaintiffs claim that defendants' alleged agreements in restraint of trade are of a type that should cause this Court to demand that defendants turn over to plaintiffs any enrichment plaintiffs may have garnered

as a consequence of those agreements. In order to recover for unjust enrichment in New York, a plaintiff must show that the defendant was enriched, that the enrichment was at plaintiff's expense and that circumstances are such that in equity and good conscience defendant should return money or property to plaintiff. *See South Shore Bank v. Int'l Jet Interiors, Inc.,* 721 F.Supp. 29, 32 (E.D.N.Y.1989).

This Court has already determined that there is insufficient evidence supporting the existence of any illicit agreements amongst the defendants. Accordingly, plaintiffs' claim for unjust enrichment is dismissed.

4. Joint Venture

■■■ Plaintiffs also bring a claim against defendants under a joint venture theory. In order to successfully make out a joint venture claim, plaintiffs must show: (1) a specific agreement to engage in a joint venture; (2) which manifests the intent of the parties to join together in a joint venture; (3) that each principal made a contribution; (4) some degree of joint proprietorship and control of the enterprise; (5) some provision for sharing of profits and losses. *See Itel Containers Inter. Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 725 F.Supp. 1303, 1310 (S.D.N.Y.1989), *aff'd in part, rev'd in part on other grounds,* 909 F.2d 628 (2d Cir.1990). Because Rosen admitted that the parties never entered into a joint venture agreement, or agreed on any profit sharing or joint control over plaintiffs' business, this claim must be dismissed. *See* Rosen Dep. at 108–09.

5. Breach of Warranty

■■■ Finally, plaintiffs also bring a claim against defendants for breach of warranty. Recognizing that issues of facts exist, the Hyundai defendants do not move this Court to grant summary judgment on this claim. The Samick defendants, however, do move for summary judgment. They claim that because they never sold pianos to plaintiffs, they may not be sued for any economic loss suffered by plaintiffs under a breach of warranty theory. Because only "sellers" are liable for breach of warranty under the New

York Uniform Commercial Code and it is undisputed that the Samick defendants never sold any pianos to plaintiffs, the Samick defendants' motion for summary judgment is granted.[10] *See County of Westchester v. General Motors Corp.*, 555 F.Supp. 290 (1983).

### III. CONCLUSION

For the above-stated reasons, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted in part and denied in part.

SO ORDERED.

---

**10.** Plaintiffs' argument that the Samick defendants should be held liable for breach of warranty because they had at some point agreed to correct certain defects as a courtesy is unavailing. Plaintiffs do not represent that the Samick defendants in any way communicated to them their intention to be held liable for the defects. Moreover, plaintiffs have not provided this Court with any authority that New York would impose liability on a non-seller manufacturer solely because that manufacturer agreed as a courtesy to correct defects in its products.