NACIREMA OPERATING CO., INC., Plaintiff,

v.

The S. S. AL KULSUM, Defendant.

MUHAMMADI STEAMSHIP CO., LTD., Claimant-Third-Party Plaintiff,

v.

UNITED ENTERPRISES & SHIPPING PTE., LTD., and Neris Shipping Co., Inc., Third-Party Defendants.

No. 73 Civ. 2368 (L.P.G.)

United States District Court, S. D. New York.

Dec. 16, 1975.

Charles L. Trowbridge, Gifford, Woody, Carter & Hays, New York City, for plaintiff.

Paul M. Jones, Cichanowicz & Callan, New York City, for defendant.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

This is an in rem admiralty action by Nacirema Operating Co., Inc. ("Nacirema"), a stevedore and terminal operator, asserting a maritime lien for stevedoring services to the Pakistan flag M.S. Al Kulsum, a vessel owned by the claimant-third party plaintiff Muhammadi Steamship Co., Ltd. ("Muhammadi"). The original action was commenced by the plaintiff in the District Court of New Jersey by the arrest of the Al Kulsum in April, 1973. Muhammadi posted security and obtained release of the vessel whereupon this action was brought in this Court upon the same allegations and theory as in the New Jersey action. Pursuant to F.R.C.W.P. 14(c) Muhammadi impleaded United Enterprises & Shipping ("United"), the time charterer of the Al Kulsum, and Neris Shipping Co., Inc. ("Neris") its general agent, tendering them as defendants directly to the plaintiff or seeking indemnity in the event of its liability. Under the charter party, however, the claim against United has been stayed pending arbitration. United answered the complaint but thereafter defaulted. In May, 1974 Neris filed a voluntary petition in bankruptcy and did not participate in the trial.

The facts as found by the court after a one day bench trial are as follows: In March of 1972 Nacirema solicited Neris for the stevedoring contracts for several of its vessels that were to unload tapioca flour at Camden, N.J. After some negotiations and exchange of correspondence during April and May 1972, Neris and Nacerima in letter form agreed upon certain rates which were to be subject to retroactive increases pending wage and price board approval. Thereafter, Neris tendered to Nacirema the Al Kulsum prior to its arrival at Camden. On June 14, 1972 Neris paid Nacirema $12,000 in advance. The Al Kulsum was worked from June 21–28, 1972 and on July 7, 1972 Nacerima submitted its original invoices. The charges were disputed but eventually the reasonable value of the services was agreed upon as $56,803.16, which amount the Court finds to be fair and reasonable. On September 29, 1972 Nacirema was paid $20,000 on account, leaving a balance due of $24,803.16.

The charter party between Muhammadi and United relieved Muhammadi of the obligation and expense of discharging cargo and contained a standard prohibition of lien clause. Prior to the performance of its services Nacirema was not aware of the charter party nor of the terms thereof. In all of its correspondence with Nacirema, Neris subscribed its letters "as agents for United Enterprises and Shipping/Manifest Lines" and upon the testimony was an agent acting for a disclosed principal. The key issue in the case therefore is whether Nacerima has the right to assert a maritime lien against the ship where at all times it contracted and dealt with a general agent engaged by the time charterer and not by the ship's owners. At the time of the contract Muhammadi had no knowledge of the contract with Nacirema, nor did Nacerima have knowledge that United was merely the time charterer.

Under Section 971 of the Ship Mortgage Act, 46 U.S.C. § 971 (1970), any person furnishing repairs or other necessaries to a vessel upon order of a person authorized by the owner has a maritime lien on the vessel which may be enforced by an in rem suit. That section further specifically provides that "it shall not be necessary to allege or prove that the credit was given to the vessel" in order for there to be a lien. Section 973 of the Act, 46 U.S.C. § 973 (1970), amended in 1971, provides that officers and agents appointed by a charterer are presumed to have authority from the owner to provide a vessel with necessaries. Prior to 1971, this presumption was not operable "when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefore." Section 974 of the Act, 46 U.S.C. § 974 (1970), states that nothing in the previous three sections is to be construed to prevent the furnisher of necessaries from waiving his right to a lien "at any time by agreement or otherwise."

The defendant here claims that Nacerima waived its right to the lien by dealing exclusively with Neris. In support of this position, it cites the recent decision in *J. T. Clarke & Son v. Neris Shipping*, 73 Civ. 2173; 1974 A.M.C. 1489 (S.D.N.Y.1974) involving these same defendants which held that the stevedore was deemed to have waived its lien against the ship by making advance payments and rendering bills to the time charterer's general agent. The facts of that case are indistinguishable from those here. Plaintiff contends that the *Clarke* case is erroneous on the issue of waiver and should not be followed. This court agrees.

The decision in the *Clarke* case does not accord sufficient weight to the Congressional policy, which is clearly expressed in the legislative history of the 1971 Amendment, of permitting the stevedore to assert a lien against the ship where the ship's agent with whom he has dealt becomes unable to pay for his services.

In finding the stevedore to have waived the right to a lien against the ship the court in *Clarke* relied heavily on the Supreme Court decision in *Marshall & Co. v. The President Arthur*, 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846 (1929), which held that a company furnishing coal to a steamship company at the owner's request where the owner posted special security was not entitled to a lien on the vessel. The Supreme Court there stated that the provisions of the Ship Mortgage Act relating to maritime liens (the present 46 U.S.C. §§ 971–974 (1970)), were not intended to alter the previous law on what constitutes a waiver of the right to a maritime lien. The Court then reviewed several early nineteenth century cases stating that where an express written contract was made for the furnishing of goods to the vessel with the contracting party giving its note or draft, the person furnishing the goods would be deemed to have waived his right to a lien on the ship by virtue of his having made an express contract. *Murray v. The Lazarus*, 17 Fed.Cas. 1049, 1051 (S.D.N.Y.1826); *Phelps v. The Camilla*, 19 Fed.Cas. 441 (D.Md.1838); *Taylor v. The Commonwealth*, 23 Fed.Cas. 756 (E.D.Mo.1875). It noted that in the case before it, the Marshall Co. had obtained from the owner of the ship special trade acceptances guaranteed by third parties before agreeing to supply the ship with coal. By virtue of taking that special security for payment of its services, the supplier is deemed to waive its maritime lien. The facts of the *President Arthur* are thus clearly distinguishable from those here, since Nacerima never sought any special security from United or Neris to insure that it would be paid. While some of the century old cases holding that reliance on an express contract constitutes a waiver of the lien may not be distinguishable on their facts from the situation here, the policy in those cases appears to be contrary to that recently enunciated by Congress in the 1971

amendments to the Ship Mortgage Act, and to later authorities.[1]

■ The maritime lien provisions of the Ship Mortgage Act, 46 U.S.C. §§ 971–974 (1970) clearly provide that a stevedore who deals with an agent or charterer has a lien against the ship.[2] Prior to the 1971 amendments to section 973 of the Act, the shipowner could avoid having the lien placed on the ship by showing that the stevedore knew or could have ascertained that the charterer did not have authority from the owner to pledge the credit of the vessel. As a result, it was a standard practice in the shipping industry to include a clause in most charter agreements that the charterer did not have authority to pledge the credit of the vessel. To remedy this situation Congress in 1971 revised section 973 by eliminating the provisions requiring the furnisher to ascertain that the operator of the ship had authority to bind the vessel as a condition of asserting a lien. The House Committee Report, H.R.Rep. No. 92–340, 1971 U.S. Code Cong. & Admin.News, p. 1363 describing the amendment states:

> The accepted practice of a "prohibition of lien" clause in a charter party and the above provision [the old provision] in Subsection R of the Ship Mortgage Act have created serious problems for American materialmen. . . . Generally, a vessel requiring necessaries is unable to give sufficient notice . . . so that the American materialman . . . usually ends up assuming the risk that his bill will be paid. This has resulted in substantial losses. . . . For example, your committee heard testimony that stevedores in the San Francisco Bay area have sustained losses over the years in excess of $2 million.
>
> * * * * * *
>
> Your committee gave careful consideration to this problem of American materialmen where the owner, by chartering or surrendering possession of the vessel, clothes the master thereof with at least apparent authority to bind the vessel for necessaries furnished to the vessel. The question presented was where a loss occurs in this situation, whether it should be suffered by the owner of the vessel, or the American materialman who furnished such necessaries in good faith.
>
> * * * * * *
>
> After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.
>
> As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put the vessel at sea.
>
> (1971 U.S.Code Cong. and Admin. News, at pp. 1364–65)

Thus, Congress clearly intended to favor the stevedore over the owner in the situation where the charterer or agent proves unable to pay for the stevedoring services.[3]

---

1. These 19th century cases cited by the Supreme Court in the S.S. Arthur apparently involved situations in which agents for a ship, with no mention of the owners, give the party furnishing supplies to the ship personal notes securing contractual obligations to make payment. *Murray v. Lazarus*, 17 Fed.Cas. 1049, 1051 (S.D.N.Y.1826); *Phelps v. The Camilla*, 19 Fed.Cas. 441 (D.Md.1838); *Taylor v. The Commonwealth*, 23 Fed.Cas. 756 (E.D.Mo. 1875). The commercial maritime conditions and practices of more than a hundred years ago which gave rise to the rule of law stated in those cases may well have been quite differ-

ent from those which prevail today. The 1971 Congressional Committee report is thus a much clearer guide as to the policy to be followed here.

2. It has long been established that under appropriate circumstances stevedoring services are to be considered necessaries furnished to a ship within the meaning of that term as used in 46 U.S.C. § 971. *In re North Atlantic and Gulf Steamship Co.*, 204 F.Supp. 899, 907 (S.D. N.Y.1962).

3. Although the amendment was most specifically aimed at eliminating abuses stemming

In light of this clearly expressed Congressional intent, we cannot agree with the implication in the *Clarke* case that the stevedore must by his conduct show an intention to retain the maritime lien. Rather the relevant question is whether the stevedore has clearly manifested an intention to forego the lien in favor of some other security. *W. A. Marshall Co. v. the S.S. President Co., supra.* Here the mere fact that Nacerima looked to United in the first instance, that it rendered bills to Neris, United's Agent, which made an advance payment, is not sufficient to indicate that there was an implied waiver of its right to a lien against the ship should Neris and United be unable to pay for the services rendered. *The A.S. Sherman,* 51 F.2d 782, 789 (N.D.N.Y.1931); *The Denelfred,* 59 F.2d 213 (E.D.Mich.1932); *Layton Industries v. Sport Fishing Cruiser Gladiator,* 263 F.Supp. 356 (E.D.Mich. 1967).[4] Nacerima took no action either affirmatively to retain its lien or to waive it. In these circumstances, given the strong Congressional policy in favor of protecting the stevedore, the statutory presumption of a lien on the vessel must prevail. Any other rule would effectively emasculate the Congressional intent in the 1971 amendment to the Ship Mortgage Act.

Nacerima therefore has a maritime lien of $24,803 against the S.S. Al Kulsum. United, which has defaulted in this action, is also jointly and severally liable for that amount. Neris is not liable for these charges as it was at all times acting as an agent for United and the existence of this agency relationship was fully disclosed to Nacerima. It is a well-established principle of the law of agency that an agent is not personally liable on a contract made on behalf of a disclosed principal. *Propstra v. Dyer,* 189 F.2d 810, 812 (2d Cir. 1951); *Cleary Brothers v. Christie Scow Corporation,* 215 F.2d 740, 743 (2d Cir. 1952).

The foregoing constitute the findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

from the insertion of "prohibition of lien" clauses in charter agreements, it also indicates a more general legislative intent to strengthen the stevedore's right to assert a maritime lien against a ship where the agent or charterer with whom he deals is unable to pay for the services rendered because of insolvency or other reasons. It thus at least to some extent should modify the traditional view that a lien for necessaries, as a secret lien, is to be narrowly construed. *Piedmont Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 13, 41 S.Ct. 1, 65 L.Ed. 97 (1920); *W. A. Marshall v. The S.S. Arthur, supra,* 279 U.S. at 567, 49 S.Ct. 420.

4. The Court agrees that, contrary to the implication in the *Clarke* case, the *A.S. Sherman* does in part stand for the proposition that a furnisher of necessaries does not waive his lien against the ship by rendering bills to the agent. In that case, a supplier of coal to a steamship billed the agent for the steamship even though it had doubts about the agent's ability to pay. There was a clear intent shown in the billing to hold the ship and the owners liable, and, on facts much stronger than those presented here, the court held there was no waiver of the lien against the ship by virtue of the fact that the bills were sent to the ship's agent. Similarly *Treakle v. Pocahontas Steamship Co.,* 273 F.Supp. 608, 612 (E.D.Va. 1967) cited by the defendants for the proposition that a supplier is not entitled to a maritime lien where he has received part payment from another party deals with a situation quite different from that here. There harbor pilots in a labor dispute with their employer claimed they were entitled to additional compensation by way of a maritime lien on ships their employer—an independent contractor—serviced. The court quite properly held that no such lien existed, as their wages were covered exclusively by a collective bargaining agreement between them and their employer.