ITEL CONTAINERS INTERNATIONAL CORPORATION, Flexi–Van Leasing Inc., Cross–County Leasing Ltd., now named Textainer Inc., and Textainer Special Equipment Ltd., Plaintiffs,

v.

ATLANTTRAFIK EXPRESS SERVICE LTD., in personam and M/V TAVARA, AES Express, AES Challenge, Nagara and Cavara, their engines, boilers, tackle, freights, etc., in rem, and Sea Containers Ltd., Seaco Services Ltd., Sea Containers Australia Ltd., Seaco Inc. and Sea Containers America Inc., in personam, Defendants.

Nos. 86 Civ. 1313 (RLC),
86 Civ. 2366 (RLC) and
86 Civ. 3717 (RLC).

United States District Court,
S.D. New York.

Dec. 11, 1991.

As Amended Feb. 6, 1992.

Watson, Farley & Williams, New York City (Alfred E. Yudes, Jr., Wendy D. Ciolino, of counsel), for plaintiff Itel Containers Intern. Corp.

Kirlin, Campbell & Keating, New York City (Michael D. Wilson, of counsel), for plaintiffs Textainer, Inc. and Textainer Special Equipment Ltd.

O'Melveny & Myers, New York City (Andrew J. Frackman, of counsel), for plaintiff Flexi–Van Leasing, Inc.

Carter, Ledyard & Milburn, New York City (James Gadsden, Jonathan F. Mack, Andris J. Vizbaras, of counsel), for defendants other than Atlanttrafik Express Service, Ltd.

## OPINION

ROBERT L. CARTER, District Judge.

The plaintiffs in this action are Itel Containers International Corp. ("Itel"), Flexi–Van Leasing, Inc. ("Flexi–Van"), Textainer Incorporated ("Textainer"), and Textainer Special Equipment, Ltd. ("TSEL"). The defendants remaining in this action are Atlanttrafik Express Service, Ltd. ("AES Ltd."), against which plaintiffs have asserted *in personam* claims, and M/V Tavara, AES Express, AES Challenge, Nagara and Cavara (collectively "the vessels"), against which the plaintiffs have asserted *in rem* maritime lien claims. The vessels owners ("the owners"), Nagara Ltd., owner of the M/V Nagara; Nagara Tam, Ltd., the owner of the M/V Tavara; Contender I Ltd., owner of the M/V Cavara; Strider I Limited, owner of the M/V AES Express and charterer of the AES Challenge; and Strider 4, Ltd., owner of the M/V AES Challenge, are also represented in this action.

## PROCEDURAL HISTORY

The background of this case is set out in previous opinions of the court, reported at 668 F.Supp. 225 (S.D.N.Y.1987) and 725 F.Supp. 1303 (S.D.N.Y.1989), familiarity with which is assumed. Plaintiffs are suppliers of maritime containers, large metal boxes used to transport maritime cargo, and chassis, frames and wheels used to move containers about. Sea Containers Limited ("SCL") organized defendant AES Ltd. in 1984 for the purpose of operating the AES shipping line. Plaintiffs had entered into container lease agreements with the previous operators of the vessels of the AES line and extended or renewed them with AES Ltd. after it began operating the line.

In the fall of 1985 SCL withdrew its support for AES Ltd., and in 1986 AES Ltd. closed down the operation of the AES

line and later went into voluntary liquidation in England.

Plaintiffs subsequently began this action alleging breach of the container lease agreements against AES Ltd., and asserting corporate veil-piercing theories as to SCL and a number of other SCL subsidiaries. Plaintiffs also asserted maritime liens against the vessels.

After trial, the court dismissed all of plaintiffs' claims, but did not discuss plaintiffs' maritime lien claims or their claims. against AES Ltd. 725 F.Supp. at 1308–14.

On appeal, the Second Circuit affirmed on all the issues discussed but remanded for findings of fact and conclusions of law on the two matters not dealt with by the trial court. *See* 909 F.2d 698 (2d Cir.1990). The parties have submitted additional briefing to the court asserting their positions on the remanded issues.

FACTS AND ISSUES ON REMAND

Plaintiffs' *in rem* claims against the vessels were secured by defendants' posting of the following bonds with the court:

| Vessel | Plaintiff | Amount |
|---|---|---|
| M/V AES Challenge | Itel | $470,000.00 |
| M/V AES Challenge | TSEL | 23,400.00 |
| M/V Tavara | Itel | 481,275.00 |
| M/V Tavara | Textainer | 7,100.00 |
| M/V Tavara | TSEL | 14,750.00 |
| M/V Cavara | Itel | 481,275.00 |
| M/V Cavara | Textainer | 10,558.81 |
| M/V Cavara | TSEL | 30,731.86 |
| M/V Nagara | Textainer | 9,779.30 |
| M/V Nagara | TSEL | 30,463.07 |

As to these claims, several disputed factual issues must be decided. The first disputed issue is whether the plaintiffs, in entering into their leases with AES Ltd., chose to forego their right to maritime liens on the vessels and relied entirely on the credit of AES Ltd. or SCL.

Itel and Textainer each learned of the acquisition of the AES line by AES Ltd., and ultimately SCL, in 1984. Each took action to increase the security of its leases. Itel sought higher rates and a guaranty of the leases by SCL. Although Itel temporarily received the higher rates, in 1985 it entered into a new lease with AES Ltd. at the old rate and did not receive a guaranty from SCL. 725 F.Supp. at 1307. Itel's leases reserved its rights to "assert maritime or other liens" on default by the lessee. Itel Ex. 1 ¶ 13(b).[1]

Textainer sought to secure information on the ownership of AES Ltd. In negotiating a new lease in 1985, Textainer did a credit check on AES Ltd. but received little information. Tr. 67–69; 725 F.Supp. at 1307.[2] Textainer's "New Business Checklist" dated December 5, 1985, indicates that some consideration may have been given to the credit of the vessels. The checklist has a space indicating whether AES's credit references were all checked. In this space is written: "Yes. For vessels see under Sea Containers X 5 ships." SC Defendants' Ex. 196. Textainer's credit manager testified that Textainer's minimum standards for deciding to issue credit to a customer do not include the customer's vessels, although Textainer does examine the books of ship owners. Geoffrey MacDonald dep. at 16, 19. However, Textainer's operations manager testified that Textainer's credit ratings of customers do include vessel ownership. Tr. 485–86. Textainer increased the credit extended to AES Ltd. after it was purchased by SCL.

---

**1.** The designation "Ex. ___" refers to exhibits introduced at trial.

**2.** The designation "Tr. ___" refers to pages of the trial transcript.

It is unclear whether TSEL took any action to obtain guarantees or what the extent of its credit checks were.

There is little evidence illuminating the issue of Itel or TSEL's reliance on the credit of the vessels. There is more evidence that Textainer gave some consideration to the vessels when leasing its containers, although evidence on this issue is also sparse. As explained in the court's discussion of waiver, *infra,* however, there is a statutory presumption that the credit of the vessels is relied upon. Therefore, in the absence of clear evidence that plaintiffs intended to forego their rights to their liens, the court must find that they did not intend to do so.

■ A second disputed issue is whether plaintiffs' containers were put to maritime use by the vessels. This issue was raised previously and decided in plaintiffs' favor in the opinion reported at 668 F.Supp. 229–30. The nature of plaintiffs' leases, which primarily envisioned maritime use of the containers, the nature of AES Ltd's business and the testimony at trial confirm this conclusion. *See, e.g.,* Itel Ex. 1; Textainer Ex. 1; TSEL Ex. 16; Tr. 574, 651.

■ A third disputed issue is whether plaintiffs' claims for damages to their equipment are for ordinary wear and tear or for damages attributable to AES Ltd. The unrefuted testimony of Itel's director of technical services was that Itel deducted ordinary wear and tear, as defined in the container inspection manual of the Institute of International Container Lessors, before billing its customers for repair expenses. Tr. 317–20; Defendants' Ex. 555. Defendants introduced testimony of an expert witness who had examined plaintiffs' repair documentation, had concluded that it did not include sufficient wear and tear deductions and produced an alternative set of repair expenses. Tr. 744–45. However, at least with respect to Itel, defendants' expert did not have a complete set of supporting documentation for his repair estimate. Hence part of the difference between his and Itel's calculations may have been due to reliance on dissimilar data. Tr. 851–55. In addition, the expert made his calculations from Itel documents that reflected damages to equipment before Itel took its deductions for wear and tear, and his testimony was not based on a personal examination of the equipment. Tr. 855–58, 872–73. There was also testimony that Itel did not repair some units until long after they were brought in, and that these delays could have caused further damage to the equipment. Tr. 280–84, 305–08, 318–19, 969. However, Itel provided estimated repair figures for equipment that had not been repaired, and a damage report was prepared for each piece of equipment as soon as it was received at an Itel depot. Tr. 260–61, 317–18. Therefore, based on the evidence adduced at trial, the court finds that plaintiffs' repair claims reflect damages attributable to AES Ltd.

■ Finally, the court must determine the date when plaintiffs' containers ceased to be used by the vessels. A confidential SCL memorandum dated February 28, 1986, discloses that sometime before that date, three of the vessels, the AES Challenge, the Nagara and the Cavara, had discharged their cargoes. As of that date the Tavara was under arrest in Italy, and the AES Express was making its last voyage. *See* Plaintiffs' Ex. 426. Since, as explained below in the court's discussion of its *in rem* jurisdiction, plaintiffs have no lien claims against the AES Express, the court finds that February 28, 1986, is the last date that plaintiffs' containers were being used by the vessels.

## DISCUSSION

### I. *Plaintiffs' Maritime Lien Claims*

#### A. *Jurisdiction*

■ Jurisdiction only exists in an *in rem* action where "the subject matter of the action, or an appropriate substitute thereof, is within the jurisdiction of the court in which the action lies." *American Bank of Wage Claims v. Registry of Dist. Court of Guam,* 431 F.2d 1215, 1218 (9th Cir.1970); *see also Tube Prods. of India v. S.S. Rio Grande,* 334 F.Supp. 1039, 1041 (S.D.N.Y.1971) (Cooper, J.). Since defendants have posted bonds in this action to

secure the *in rem* claims of plaintiffs Itel, Textainer and TSEL, the court has jurisdiction over the *in rem* claims of these plaintiffs.

■ Plaintiff Flexi–Van, however, has not arrested any of the defendant vessels within the jurisdiction of the court; nor have defendants posted bonds with the court to secure Flexi–Van's claims. Instead, Flexi–Van arrested the M/V Tavara in Livorno, Italy. SCL posted security in Italy for the release of that vessel.

■ Normally, failure to arrest or cause security to be posted within a court's jurisdiction is fatal to *in rem* jurisdiction. *See American Bank of Wage Claims, supra,* 431 F.2d at 1218; *Burns Bros. v. Long Island R. Co.,* 176 F.2d 950 (2d Cir.1949); *Carroll v. United States,* 133 F.2d 690 (2d Cir.1943); *Tube Prods., supra,* 334 F.Supp. at 1041. Nonetheless, a vessel owner may waive objection to *in rem* jurisdiction under certain circumstances, *Continental Grain Co. v. Federal Barge Lines, Inc.,* 268 F.2d 240 (5th Cir.1959), *aff'd* 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960), although such a "waiver" may in reality take the form of a posting of security. *See Cargill B.V. v. S/S "Ocean Traveller",* 726 F.Supp. 56, 57 (S.D.N.Y.1989) (Leval, J.) (allowing the issuance of a letter of undertaking to be the basis of jurisdiction). However, such a waiver is normally made in the same court which takes jurisdiction, rather than in another forum. *See Cargill B.V., supra,* 726 F.Supp. at 57; *Continental Grain, supra.* Since in the present case, the only possible waiver occurred in Italy, the court lacks jurisdiction over Flexi–Van's *in rem* claims.[3] Therefore they must be dismissed.[4]

The court also lacks jurisdiction over plaintiffs' *in rem* claims against the AES Express, since none of the plaintiffs have caused the vessel to be arrested within the court's jurisdiction or succeeded in having bonds posted to secure their claims against it.

**B.** *Whether Plaintiffs' Containers are Necessaries*

■ Plaintiffs' maritime lien claims against the vessels are based on the Federal Maritime Lien Act, 46 U.S.C. § 971 *et seq.* (1988),[5] which provides, in pertinent part:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel … shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

Defendants contend that plaintiffs' containers were not "necessaries" under the Act. The court dealt with this argument in its previous opinion, 668 F.Supp. at 227–31, and held to the contrary. That holding is the law of the case.

In that opinion, the court held that " 'the word "necessaries" should be broadly interpreted: the test is whether the supplies and services furnished are reasonably needed in the ship's business.' " 668 F.Supp. at 228 (quoting *Nautilus Leasing Servs., Inc. v. M/V Cosmos,* 1983 A.M.C. 1483, 1483 (S.D.N.Y.1983) (MacMahon, J.) (citation omitted)). The court also held that "[t]he term 'includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her par-

---

**3.** The court notes that *Cactus Pipe & Supply Co. v. M/V Montmartre,* 756 F.2d 1103 (5th Cir. 1985) holds that merely by appearing in an *in rem* action and filing a Claim of Owner, the owner waives any objection to *in rem* jurisdiction. However, the court will not apply the majority holding of that case here since it finds the reasoning of the dissent, which would require actual consent, more persuasive. Maritime liens are limited by the amount of the proceeds from the sale of the arrested ship, or by the security posted by the owner. If actual consent is not required, and thus the posted

security or the vessel is not available as a measuring rod, the court possesses no standard by which to limit recovery.

**4.** The dismissal of Flexi–Van's claims makes unnecessary any discussion the vessels' *in rem* liability to Flexi–Van. Therefore the expression "plaintiffs" in the *in rem* section of this opinion will only refer to Itel, Textainer and TSEL.

**5.** The act was repealed and recodified at 46 U.S.C. § 31341 (1991), effective January 1, 1989.

ticular function. Necessaries are things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged....'" 668 F.Supp. at 228 (quoting *Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 603 (5th Cir.1986) (en banc), *cert. denied* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986)). In addition, the court held that "[i]t is the present, apparent want of the vessel, *not the character of the thing supplied,* which makes it a necessary." *Id.* ((citations omitted) (emphasis added)). Applying these principles, the court had no difficulty holding that plaintiffs' containers were necessaries within the meaning of the Act. *See* 668 F.Supp. at 228.

The evidence adduced at trial confirms that plaintiffs' containers were used in a manner consistent with this holding. Plaintiffs' containers were delivered to AES Ltd. and used by its vessels. While AES Ltd. leased two to three times as many containers as its fleet capacity could accommodate, as explained previously, a ship may need as many as three times the containers as it has capacity for. *See* 668 F.Supp. at 229.

■ Defendants, however, argue for a reversal of the court's previous holding on the basis that certain portions of the container leases are "preliminary to" the maritime contract, presumably those portions of the lease that occur before the containers are actually placed on board ship. Defendants' reading of the "preliminary to" cases is not in accord with the law of this Circuit. The "preliminary to" cases do hold that certain services provided to vessels are not within the court's admiralty jurisdiction because they are "preliminary to" maritime contracts.[6] *See, e.g., Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.,* 739 F.2d 798, 801–02 (2d Cir.1984) (holding that general agency agreements to procure "husbanding" service for a vessel are preliminary services not within maritime jurisdiction), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985). However, this doctrine

has not been extended to container leasing agreements. Such agreements have been held to be within the court's maritime jurisdiction, even when the containers are leased by a general agent to be subsequently leased to vessels. *See CTI–Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377, 378–81 (2d Cir. 1982). Therefore, defendants' argument that the containers were preliminary supplies not within the court's maritime jurisdiction for periods before they were placed aboard ship must fail.

## C. Whether Plaintiffs' Containers Were "Furnished" to the Vessels

Defendants contend that plaintiffs' containers were not "furnished" to the defendant vessels within the meaning of the Act because the containers were leased to the fleet through AES Ltd. rather than leased to the individual vessels. Thus defendants argue that the containers must (1) "be earmarked for a particular vessel," and (2) "be furnished to that vessel by the lienor." SC Defendants' Memorandum of Law on Remand at 26. Defendants contend that the containers in the present case do not meet these requirements. This argument has also been rejected by the court, 668 F.Supp. at 230–31, but defendants ask the court now to reach a contrary determination.

■ In its earlier opinion, the court held that "a lien may attach when services or supplies are provided to a fleet of vessels as long as title is not diverted to an intermediary." 668 F.Supp. at 230. Maritime liens can arise if supplies are furnished to a fleet of vessels and delivered to the fleet owner, or delivered to an intermediary who delivers them to the vessels, as long as the intermediary does not take title to the supplies. *See Bankers Trust Co. v. Hudson River Day Line,* 93 F.2d 457, 459 (2d Cir. 1937) ("[T]he supplyman may, in effect, make the owner his agent to complete the 'furnishing' by putting the goods on board."); *Equilease Corp. v. M/V Samp-*

---

6. The issue of whether supplies are necessary to the operation of a vessel is not the same issue as whether they are sufficiently within maritime commerce to be the basis of maritime jurisdic-

tion. However, these two issues are sufficiently related in this case for maritime jurisdiction cases to be helpful in deciding whether supplies are necessary to maritime operation of a vessel.

*son,* 793 F.2d 598, 603 (5th Cir.1986) (en banc) ("To read 'furnishing' as requiring an actual thing to be physically delivered to the vessel would foreclose any intangible services from ever being held necessaries under section 971."), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986); *Jeffrey v. Henderson Bros.,* 193 F.2d 589, 590, 594 (4th Cir.1951) (rejecting argument that delivery of supplies to owner rather than directly to the vessel defeated a maritime lien). Because containers leased for maritime use are "the functional equivalent of the hold of the vessel," *CTI–Container, supra,* at 682 F.2d at 381, delivery of containers to an agent, who in turn delivers them to vessels, does not effect a cut-off of liability. Accordingly, defendants' argument that containers must be directly delivered to the vessels in order to be "furnished" to them has no merit.

■ The other prong of defendants' argument is that even if containers are not required to be directly delivered to the vessels, they must be earmarked for individual vessels in order to sustain a valid maritime lien. This must also be rejected. As stated in the court's previous opinion: " 'for the purposes of creating a valid maritime lien, it may not be essential, and indeed may not be desirable, that the container [or chassis] be ... earmarked for a particular vessel.' " 668 F.Supp. at 230 (quoting *Transamerica ICS, Inc. v. M/V Panatlantic,* 1984 A.M.C. 489 (S.D.Fla.1983)); *Accord Orbis Marine Enters., Inc. v. TEC Marine Lines, Ltd.,* 692 F.Supp. 280, 283–84 (S.D.N.Y.1988) (Conboy, J.) ("It is impractical, as well as uneconomical, to require that the containers be required by specific vessels.").

■ *Bankers Trust, supra,* is the only relevant precedent relied on by the defendants that was not discussed in the court's earlier opinion. Defendants argue that this case stands for the proposition that a supplier must earmark and bill supplies to a particular ship. In *Bankers Trust* an oil company delivered oil to a vessel owner's

barge for delivery by the owner to any of its vessels. The court, applying *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), held that the oil company did not have a valid maritime lien, relying on the fact that neither the parties' conduct nor their contract indicated that they intended to create a maritime lien, and that the owner could distribute oil to any of his vessels as he saw fit. *See* 93 F.2d at 458, 459.

A contemporaneous opinion written by Judge Swan, the author of *Bankers Trust,* sheds light on how the decision should be interpreted. *The Transmarine Barge No. 100,* 62 F.2d 252 (2d Cir.1932), involved a towing company that towed fleets of barges for a barge operator. The towing company billed its services according to the tonnage of the fleet rather than that of the barges. Neither party kept records of the tonnage of the individual barges; therefore the towing company desired a lien on the barge operator's fleet. *See* 62 F.2d at 252–53. In that case, Judge Swan, again applying *Piedmont,*[7] ruled that a valid fleet lien existed, apportioning liability equally among the vessels of the barge operator's fleet. The court, stating that "[i]t would be most unjust to suppose that this procedure was intended to deprive the tower of a lien," held that the parties' agreement contemplated reliance on the credit of the barges and that this credit should be equally divided among them. *See* 62 F.2d at 253–54; *see also Carr v. George E. Warren Corp.,* 2 F.2d 333 (4th Cir.1924) (apportioning fleet lien equally between ships when supplies were not designated for either, based on intent of the parties); *The American Eagle,* 30 F.2d 293 (D.Del.1929) (apportioning lien between ships based on ships' operating time and capacity based on intent of parties).

Read in the context of *Transmarine, Bankers Trust* stands only for the proposition that a lien on a fleet of ships will be enforced, and apportioned among them, if

---

7. The difficulties in interpreting the *Piedmont* decision are discussed in the courts' summary judgment opinion. *See* 668 F.Supp. at 231.

the parties' agreement and conduct indicate that this was their intent. Accordingly, the court is satisfied that defendants' reliance on *Bankers Trust* is misplaced.

Moreover, requiring containers to be earmarked for specific vessels would greatly interfere with industry practice in the container leasing business. Maritime use of containers has been characterized as " 'one of the most important technological developments in the transportation of goods by sea since steam replaced sail.' " *CTI–Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377 (2d Cir.1982) (quoting Seymour Simon, *The Law of Shipping Containers*, 5 J.Mar.L. & Com. 507, 507 (1974)). Industry practice is to lease containers to fleets rather than to particular vessels. Tr. 716–17. There are sound business reasons for this practice:

> [T]he very nature of the industry is such that the container lessor does not and cannot maintain records of the use by its lessee of individually enumerated containers on given vessels or on given voyages.... [T]he available records which indicate the movement of a given container within the carrier's area of services are almost *entirely* the business records of the ocean carrier itself. The last several years have seen the demise of a number of major ocean carriers. In some of these cases the ocean carrier simply disappeared and its business records, often located in some distant country, were completely unavailable.

Kieron F. Quinn, *Ocean Container Leasing and Maritime Liens: An Example of Flexibility in U.S. General Maritime Law*, 18 J.Mar.L. & Com. 1, 27 (1987) (emphasis in original). Defendants' narrow reading of the Maritime Lien Act would result in the denial of credit to vessel operators seeking to lease containers, upset accepted practices in the container leasing industry and significantly erode the purposes of the Act.

#### D. *Waiver of Maritime Liens*

In its prior opinion, 668 F.Supp. at 230 n. 6, the court left for resolution at trial the issue of whether plaintiffs relied on the credit of AES Ltd., rather than their security interests in the vessels, in entering into their leases.

 A supplier of necessaries to vessels may waive a maritime lien by choosing not to rely on the statutorily granted security interest in the vessels. *See* 46 U.S.C. § 974 (1988) ("Nothing in this chapter shall be construed to prevent the furnisher of ... necessaries ... from waiving his right to a lien."); *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 277, 60 S.Ct. 937, 942, 84 L.Ed. 1197 (1940). Moreover, "an express renunciation of the lien is not essential," a supplier may waive the lien by taking action which indicates that it is not being relied on. *W.A. Marshall & Co. v. The President Arthur*, 279 U.S. 564, 568, 49 S.Ct. 420, 421, 73 L.Ed. 846 (1929).

 However, there is a legal presumption that a supplier of necessaries has not waived its maritime lien. Therefore, the burden is on the party alleging waiver to prove that the supplier has in fact chosen to forego its lien. *See* 46 U.S.C. §§ 971, 974 (1988) (" [I]t shall not be necessary to allege or prove that credit was given to the vessel."); *W.A. Marshall, supra*, 279 U.S. at 567–68, 49 S.Ct. at 421; *Equilease, supra*, 793 F.2d at 605; *Nautilus Leasing Servs., Inc. v. M/V Cosmos*, 1983 A.M.C. 1483 (S.D.N.Y.1983) (MacMahon, J.) ("The statutory language could hardly be clearer."). Moreover, this policy disfavoring waiver was reinforced by the 1971 amendment to the Act, which strengthened the presumption against waiver. *See Nacirema Operating Co., Inc. v. S.S. Al Kulsum*, 407 F.Supp. 1222, 1226 (S.D.N.Y.1975) (Gagliardi, J.) (" [T]he statutory presumption of a lien on the vessel must prevail. Any other rule would effectively emasculate the Congressional intent in the 1971 amendment.").

 A party may successfully defeat a maritime lien on a vessel by proving that the supplier took other security for payment and chose to forego the protection of the lien. *See W.A. Marshall, supra*, 279 U.S. at 565–66, 571–72, 49 S.Ct. at 422–23. However, if a supplier takes security for

payment, and expressly reserves the right to assert the lien, the supplier will not be held to have waived its lien, *see Signal Oil, supra,* 310 U.S. at 277, 60 S.Ct. at 942, because a supplier is entitled to rely on both the owner's credit and the credit of the vessel. *See Piedmont, supra,* 254 U.S. at 10, 41 S.Ct. at 3; *Signal Oil, supra,* 310 U.S. at 276, 60 S.Ct. at 941; *In re Marine Transit Corp.,* 94 F.2d 7, 9 (2d Cir.1938). In addition, contracting and doing business with a charterer rather than the owner, as plaintiffs did in this case, does not constitute waiver. *See Nacirema, supra,* at 1225.[8]

There is little evidence on which to base any inference that plaintiffs waived their liens. Moreover, even if it could be shown that plaintiffs' credit investigations were limited to AES Ltd. and SCL, this would not satisfy defendants' burden because plaintiffs are entitled to rely on the credit of the owner or operator as well as that of the vessel. Merely showing that plaintiffs did not take affirmative steps indicating that they were relying on the credit of the vessels is not sufficient to satisfy defendants' burden. Therefore, defendants have not met their burden of showing waiver of maritime liens by plaintiffs.

### E. *In Custodia Legis*

■ When a vessel is in the custody of the court, with some exceptions, the doctrine of *in custodia legis* prevents new liens from accruing against it except those for supplies and services that are necessary for the ship's care and preservation. *See, e.g., Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930). Defendants argue that in the present case, although the vessels are not in the custody of the court, the bonds posted for the vessels place them in the constructive custody of the court and therefore the doctrine of *in custodia legis* should apply. Hence defendants assert that all of plaintiffs' claims invoiced after the bonds were posted must be disallowed.

While in most situations, "[t]he stipulation for value is a complete substitute for the res," *J.K. Welding v. Gotham Marine Corp.,* 47 F.2d 332, 335 (S.D.N.Y.1931) (Woolsey, J.), for over a century, the law in this court has been that if a court possesses a stipulation for value rather than the vessel, the doctrine of *in custodia legis* does not apply. In *The Young America,* 30 F. 789 (S.D.N.Y.1887) (Brown, J.), the court held that "[t]he rule excluding subsequent liens cannot be extended to vessels that are not actually, as well as constructively, in the marshall's possession." 30 F. at 791. Therefore the vessels are not *in custodia legis,* and plaintiffs' claims are not limited to charges invoiced before bonds were posted for the vessels. Moreover, even if the opposite rule existed, it is uncertain whether the doctrine of *in custodia legis* would apply. Most, if not all of plaintiffs' invoices related to periods before the vessels were constructively arrested even though they were billed after the arrest.

### F. *Damages*

#### 1. *Measure of Damages*

■ Plaintiffs may only be awarded *in rem* damages for "necessaries," things "that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged." 668 F.Supp. at 228 (citation omitted). Plaintiffs urge the court to use their leases with AES Ltd. to determine the amount of their damages. However, plaintiffs fail to distinguish the *in personam* liability of AES Ltd. from the *in rem* liability of the vessels. Their contracts with AES Ltd. govern their *in personam* damages, while the Act allows *in rem* damages only for "necessaries." *Cf. Inland Credit Corp. v. M/T Bow Egret,* 552 F.2d 1148, 1155 n. 9 (5th Cir.1977) ("[Plaintiffs] are recovering by virtue of their status as lien claimants rather than on their notes.") While their contracts with AES Ltd. may be of aid in

---

**8.** The reasoning in *John T. Clark & Son, Inc. v. Neris Shipping Co.,* 1974 A.M.C. 1489 (S.D.N.Y. 1974) (Bauman, J.) implies the opposite, but will not be adhered to here because, as was later explained in *Nacirema,* this case's reasoning is "erroneous on the issue of waiver and should not be followed." 407 F.Supp. at 1224.

determining what a prudent owner would provide for the vessels, they are not controlling for the purposes of determining plaintiffs' damages under the statute.

### 2. Apportionment

■ In cases where courts have apportioned lien claims among a fleet, they have usually chosen equal apportionment among all the vessels of the fleet. *See Transmarine, supra,* 62 F.2d at 253–54; *Carr, supra,* 2 F.2d at 334. However, the equal apportionment approach is not mandated when it would produce an inequitable result. *See Warrior Tombigbee Transp. Co., Inc. v. 5,775.674 Net Tons of Coal,* 570 F.Supp. 1405, 1412 (S.D.Ala.1983) (holding that each *res* can be held liable for services "actually provided or *reasonably attributable* to it.") (emphasis added); *The American Eagle, supra,* 30 F.2d at 295 (basing apportionment on characteristics of the ships); Quinn, *supra,* 18 J.Mar.L. & Com. at 29 (" [A]n appropriate way of valuing lessors' liens would be to apply a percentage of the ocean carriers' obligations to the lessor based upon the ratio between the capacity of the vessel under arrest and the capacity of the entire fleet"). Therefore, to avoid inequity the court will apportion plaintiffs' liens according to the ships' relative Twenty-foot Equivalent Units. ("TEU").[9] The relative TEU of the defendant vessels are: Tavara—1,212 TEU, Nagara—1,212 TEU, Cavara—1,308 TEU, AES Express—329 TEU, AES Challenge—328 TEU. Plaintiffs' Ex. 92, 131, 362–64. Summing up these TEU figures, the entire fleet's capacity is equal to 4389 TEU. Each vessel's individual capacity must now be divided by 4389 in order to determine the percentage of the fleet's liability attributable it. These calculations indicate that the Tavara is liable for 27.6% of the fleet's liability, the Nagara for 27.6%, Cavara for 29.8%, and the AES Challenge for 7.5%.[10]

### 3. Rental

■ Plaintiffs Itel, Textainer and TSEL each seek damages for unpaid per diem

rental of containers. Container rental fees undoubtedly fall within the statutory definition of necessaries, being the type of fees that a prudent owner would undoubtedly expect to pay for the provision of the containers. Plaintiffs' rental charges, however, must be limited to the time period during which the containers were actually "necessaries." As found above, as of February 28, 1986, plaintiffs' containers were no longer being used by the vessels. Therefore per diem rental may not be awarded after this date.

■ Plaintiffs' rental charges also included amounts for "Lease Out," "Turn In," "Drop Off" and "Handling." These are normal administrative charges related to the costs of providing containers to and receiving them from the vessels. Tr. 723. The court finds these charges sufficiently related to the provision of containers to the vessels that they come within the definition of necessaries. In addition, these charges are within the definition even if they were invoiced after February 28, because they are invoiced without regard to the date containers are returned. Plaintiffs' rental charges also include amounts for the Damage Protection Plan, a form of prepaid insurance covering some damages. Tr. 319. Modern courts have decided that vessel insurance is so necessary to the operation of a vessel that it gives rise to a maritime lien. *See, e.g., Equilease, supra,* at 604 (" [I]nsurance is something every vessel today needs just to carry on its normal business."). While insurance for containers is not identical to vessel insurance, container insurance is something a prudent vessel owner would provide and is therefore a necessary.

Itel's unpaid invoices for per diem rent through February 28, 1986, and for its administrative charges support a recoverable rental award for "reefers" (refrigerated containers) of $208,584.00, a recoverable rental award for chassis of $910.00, and a

---

**9.** Twenty-foot Equivalent Units are measures of container capacity. *See* Quinn, *supra,* 18 J.Mar.L. & Com. at 4 n. 13.

**10.** The AES Express would be liable for the remaining 7.5% if the court had jurisdiction over plaintiffs' claims against it.

recoverable rental award for dry vans of $201,358.00. Itel Ex. 8, 11. Textainer's unpaid invoices for per diem rent and administrative charges support a recoverable rental award of $23,784.37. Textainer Ex. 2, 3. TSEL's unpaid invoices support a recoverable rental and handling charge award of $23,984.13. TSEL Ex. 3, 4, 6.

#### 4. *Repairs, Cost of Recovery and Replacement Value*

■ Plaintiffs Itel, TSEL and Textainer also seek damages for repairs not covered by prepaid insurance, recovery costs incurred in reclaiming units not returned by AES Ltd. and replacement value for equipment not recovered. Because a prudent owner would expect to pay for repairs to rented containers and replacement for containers that were lost, these fees are necessary to the operation of a modern container ship. Since testimony indicated that leased containers are normally returned to the lessors' depots and plaintiffs' leases envisioned such a return, Tr. 275; Itel Ex. 1; Textainer Ex. 1, recovery costs are also necessaries.

■ Itel's documentation, however, lumps "handling," "drayage," "storage," and "other" expenses with its "recovery" expenses and terms the sum its total recovery costs. Itel Ex. 6; Tr. 260. No explanation for this lumping was given at trial. Tr. 260. The "handling," "drayage," "storage," and "other" expenses do not seem to be closely associated with recovery of Itel's equipment, since they are charged for many leased containers which have no "recovery" expenses. Itel Ex. 6. Therefore the court will award Itel only those expenses in the "recovery" category, those which the record supports as recovery costs.

Itel's unpaid repair invoices and equipment condition reports support an award of $353,762.78 for actual container repairs, $329,096.58 for estimated container repairs and $4,022.02 for dry van repairs. Itel Ex. 6, 8, 9. Itel documentation supports an award of $1,858.70 in recovery expenses. Itel Ex. 6, 9; Tr. 260. Itel will also be awarded $92,000 for container replacement value and $2,250 for dry van replacement

value. Itel Ex. 4, 7, 8; Tr. 84–85, 265–66, 314–15.

Textainer documentation supports an award of $2,975.13 in recovery expenses. Textainer. Ex. 2, 17; Tr. 461–62.

TSEL has submitted unpaid invoices and documents supporting an award of $23,971.39 for repairs. TSEL Ex. 3. TSEL documentation supports $9,489.01 in recovery expenses. TSEL Ex. 4, 11, 14; Tr. 471–72.

TSEL has presented conflicting claims of replacement value damages. In the Joint Pre–Trial Order, TSEL claims replacement value for eight units totalling $21,356.00. Joint Pre–Trial Order at ¶ 3.C. However, TSEL's invoices for unrecovered units only cover six of these units, and total $15,175.68. TSEL Ex. 12. Since only the $15,175.68 figure has supporting documentation, the court will use it as the measure of TSEL's damages for unrecovered units.

#### 5. *Attorney's Fees*

■ Plaintiffs claim attorney's fees as part of their damages. However, the normal rule both within and outside maritime law concerning attorney's fees is that "in the absence of statute or contractual authorization, attorney's fees are not generally recoverable either as part of costs or of damages." *Demsey & Assocs., Inc. v. S.S. Sea Star*, 500 F.2d 409, 411 (2d Cir. 1974). Thus, while it is reasonable to expect AES Ltd., whom plaintiffs have contracts with, to pay plaintiffs' attorney's fees, *see infra*, such an expectation of the vessel owners is not reasonable.

Cases in which attorney's fees have been awarded in *in rem* maritime actions are clearly distinguishable as suits to foreclose on mortgages. *See, e.g., Gen. Elec. Credit Corp. v. The Oil Screw Triton, VI*, 712 F.2d 991 (5th Cir.1983). In those cases, the plaintiffs brought suit on notes that allowed them to proceed against the owner of the vessel. *See* 712 F.2d at 993–94. Such cases fit within the normal rule regarding attorney fee awards authorized by contract. Since in the present case plaintiffs have no contract with the vessel own-

ers, their attorney's fees are excluded from their damage award.

### 6. *Prejudgment Interest*

Plaintiffs also claim prejudgment interest. In admiralty cases, prejudgment interest is normally awarded, although the court is given broad discretion in this regard to choose the period in which this interest runs and the rate of interest. *See Indep. Bulk Transp., Inc. v. The Vessel "Morania Abaco",* 676 F.2d 23, 25–27 (2nd Cir.1982). The court will award plaintiffs prejudgment interest at 6% per annum, beginning on May 31, 1986. As of this date, plaintiffs reasonably could have expected their containers to be returned, and rent and repair costs to be paid for them. A number of the bonds posted in this court to secure plaintiffs' claims limit the recoverable interest to 6%, and the court finds this figure to be a reasonable rate to compensate them for their loss of use of the funds owed them. Interest will be calculated for a sixty-six month period, up to the time of this opinion.

### 7. *Plaintiffs' Total Damages*

Based on the foregoing, plaintiffs' total maritime lien damages are the following.

ITEL

| Item | Amount |
|---|---|
| (1) Reefer Container Rental | $ 208,584.00 |
| (2) Chassis Rental | 910.00 |
| (3) Dry Vans | 201,358.00 |
| (4) Actual Repairs | 353,762.78 |
| (5) Estimated Repairs | 329,096.58 |
| (6) Dry Van Repairs | 4,022.02 |
| (7) Recovery Expenses | 1,858.70 |
| (8) Container Replacement Value | 92,000.00 |
| (9) Dry Van Replacement Value | 2,250.00 |
| Subtotal | $1,193,842.08 |
| Interest | 393,967.89 |
| Total | $1,587,809.97 |

TEXTAINER

| Item | Amount |
|---|---|
| (1) Rental | $23,784.37 |
| (2) Recovery Expenses | 2,975.13 |
| Subtotal | $26,759.50 |
| Interest | 8,830.64 |
| Total | $35,590.14 |

TSEL

| Item | Amount |
|---|---|
| (1) Rental | $23,984.13 |
| (2) Repairs | $23,971.39 |
| (3) Recovery Expenses | 9,489.01 |
| (4) Replacement Value | 15,175.68 |
| | |
| Subtotal | $72,620.21 |
| Interest | $23,964.67 |
| | |
| Total | $96,584.88 |

Each vessel, however, may only be assessed the *in rem* damages apportionable to it, according to the apportionment percentages calculated above. Therefore Itel's claim is entitled to be apportioned 7.5% to its lien against the AES Challenge, 27.6% to its lien against the Tavara, and 29.8% to its lien against the Cavara. This apportionment results in a $119,086 judgment against the AES Challenge, a $438,-236 judgment against the Tavara and a $473,167 judgment against the Cavara.

Textainer's claim will be apportioned 27.6% to its lien against the Tavara, 29.8% to its lien against the Cavara and 27.6% to its lien against the Nagara. This apportionment entitles Textainer to a $9,823 judgment against the Tavara, a $10,606 judgment against the Cavara and a $9,823 judgment against the Nagara. However, Textainer's claim on the Tavara is limited to the bond amount, $7,100, plus six percent interest, which equals $9,443. Therefore Textainer's judgment against the Tavara must be limited to $9,443.

TSEL's claim is entitled to be apportioned 7.5% to its lien against the AES Challenge, 27.6% to its lien against the Tavara, 29.8% to its lien against the Cavara and 27.6% to its lien against the Nagara. This apportionment results in a $7,244 judgment against the AES Challenge, a $26,657 judgment against the Tavara, a $28,782 judgment against the Cavara and a $26,757 judgment against the Nagara.

However, TSEL's claim against the Tavara is limited to the bond amount, $14,750, plus six percent interest, which equals $19,618. Therefore TSEL's judgment against the Tavara must be limited to $19,618.

## II. *Default Judgment Against AES Ltd.*

▆▆ Plaintiffs[11] are entitled to a default judgment against AES Ltd. AES Ltd. has not officially appeared in this action and has been put into voluntary liquidation. Since AES Ltd. is being liquidated in England and there is no indication that it has filed for protection in United States bankruptcy proceedings, the United States bankruptcy laws do not afford AES Ltd. protection from this litigation. *See* 11 U.S.C. §§ 304, 362 (1988). Hence, there is no reason why a default judgment should not be entered against AES Ltd.

Plaintiffs' leases with AES Ltd. entitle them to all the damages they seek, except for reductions due to lack of documentation noted above in the discussion of their *in rem* claims, and the reduction due to lack of documentation for Flexi–Van discussed below.

In addition to the rent awarded for plaintiffs' *in rem* claims, they can collect rent up until the time that they actually recovered their equipment. Therefore, Itel is entitled to collect the full $240,960.20 that it claims for dry van rental, the full $307,-493.00 it claims for reefer per diem rental

---

**11.** In the discussion of plaintiffs' *in personam* judgment against AES Ltd., the term "plaintiffs" will refer to Itel, Textainer, TSEL and Flexi–Van.

and the full $3,030.00 that it claims for chassis rental. In addition, although most of Itel's equipment was recovered by May 31, 1986, seven reefers were not recovered until later. Itel is entitled to collect additional rent due to this late recovery of $18,513.00. Itel Ex. 11. Textainer can collect the full $24,512.37 in rental that its documentation supports. TSEL is entitled to collect the full $27,208.43 that its documentation supports.

Flexi-Van can recover the following damages: $197,384.61 in pre-default rental, $56,372.15 in post-default rental, $337,383.07 in repairs and $71,399.94 in recovery expenses. Flexi-Van Ex. 3, 4, 13, 17, 21. Flexi-Van also claims damages for $58,353.15 in casualty value for lost equipment. However, Flexi-Van's documentation lists its claim at $54,415.83. Flexi-Van Ex. 18.

Therefore the court must award Flexi-Van $54,418.83.

Plaintiffs' leases entitle them to collect attorney's fees as part of their judgment against AES Ltd. Itel Ex. 1A ¶ 5(e); Textainer Ex. 1, App. 3, ¶ 9; TSEL Ex. 2, 16; Flexi-Van Ex. 6 ¶ 9, Ex. 7 ¶ 9, Ex. 8 ¶ 9.

Plaintiffs can collect interest as indicated in their leases. Therefore Itel is entitled to collect 12% interest, and Textainer and TSEL 1½% per month (18% per year). Flexi-Van is entitled to 14% interest. Itel Ex. 1A ¶ 2(d); Textainer Ex. 1, App. 3, ¶ 3(a); TSEL Ex. 16; Tr. 470–71; Flexi-Van Ex. 7, ¶ 6; Ex. 8, ¶ 6.[12]

Based on the foregoing, plaintiffs' *in personam* damages against AES Ltd. are as follows.

## ITEL

| Item | | Amount |
|------|--|--------|
| (1) | Reefer Container Rental | $ 307,493.00 |
| (2) | Chassis Rental | 3,030.00 |
| (3) | Dry Vans | 240,960.20 |
| (4) | Late Recovery Rental | 18,513.00 |
| (5) | Actual Repairs | 353,762.78 |
| (6) | Estimated Repairs | 329,096.58 |
| (7) | Dry Van Repairs | 4,022.02 |
| (8) | Recovery Expenses | 1,858.70 |
| (9) | Container Replacement Value | 92,000.00 |
| (10) | Dry Van Replacement Value | 2,250.00 |
| | Subtotal | $1,352,986.28 |
| | Interest | 892,970.94 |
| | Total | $2,245,957.00 |

## TEXTAINER

| Item | | Amount |
|------|--|--------|
| (1) | Rental | $24,512.37 |
| (2) | Recovery Expenses | 2,975.13 |

12. Two of Flexi-Van's leases entitle it to 15% interest and one entitles it to 12%. *See* Flexi-Van Ex. 6 ¶ 6; Ex. 7, ¶ 6; Ex. 8, ¶ 6. Due to the difficulty in separating out from Flexi-Van's documentation which invoices are covered by which leases, the court will award Flexi-Van 14%.

| | |
|---|---|
| Subtotal | $27,487.50 |
| Interest | 27,212.63 |
| **Total** | **$54,700.00** |

## TSEL

| Item | Amount |
|---|---|
| (1) Rental | $ 27,208.43 |
| (2) Repairs | 23,971.39 |
| (3) Recovery Expenses | 9,489.01 |
| (4) Replacement Value | 15,175.68 |
| Subtotal | $ 75,844.51 |
| Interest | 75,086.06 |
| **Total** | **$150,931.00** |

## FLEXI–VAN

| Item | Amount |
|---|---|
| (1) Pre-default Rental | $ 197,384.61 |
| (2) Post-default Rental | 56,372.15 |
| (3) Casualty Value | 54,415.83 |
| (4) Repairs | 337,383.07 |
| (5) Recovery Expenses | 71,399.94 |
| Subtotal | $ 716,955.60 |
| Interest | 552,055.81 |
| **Total** | **$1,269,011.00** |

## CONCLUSION

Accordingly, judgment is entered in favor of plaintiffs Itel, Textainer and TSEL against the vessels as indicated in the discussion of their *in rem* claims, with costs. Judgment is entered in favor of Itel, Textainer, TSEL and Flexi–Van against AES Ltd. as indicated in the discussion of their *in personam* claims, with attorney's fees and costs. Since plaintiffs have not submitted an accounting of their attorney's fees, they are directed to submit such an accounting to the court.

Itel, Textainer and TSEL's recovery against AES Ltd. is to be reduced by any amounts recovered from the vessels.

IT IS SO ORDERED.